# EXHIBIT 9

EXHIBIT 9 - PAGE 130

**TWC Administration LLC**
60 Columbus Circle
New York, NY 10023

| Pay Group: | AMB-San Diego Hourly Bi Weekly | Business Unit: DB73A |
| Pay Begin Date: | 04/24/2015 | Advice #: 000000021693162 |
| Pay End Date: | 05/07/2015 | Advice Date: 05/14/2015 |

Jessica J Hueneberg
10540 La Morada Dr
San Diego, CA 92124-1014

| Employee ID: 1200916 | | TAX DATA: | Federal | CA State |
| Department: 002-Customer Service | | Marital Status: | Married | Married |
| Location: 10450 Pacific Center Ct | | Allowances: | 0 | 0 |
| Pay Rate: $12.360000 Hourly | | Addl. Pct.: | | |
| | | Addl. Amt.: | | |

## HOURS AND EARNINGS

| Description | Begin Date | End Date | Rate | Current Hours | Earnings | YTD Hours | Earnings |
|---|---|---|---|---|---|---|---|
| Reg-Hrly | | | 12.360000 | 76.98 | 951.48 | | |
| Ot-Hrly | | | 18.541872 | 4.06 | 75.28 | | |
| Ot-Hrly | 04/10/2015 | 04/16/2015 | 18.541667 | 0.72- | 13.35- | | |
| Ot-Hrly | 04/10/2015 | 04/16/2015 | 18.666667 | 0.72 | 13.44 | | |
| Sick-Hrly | | | 12.360000 | 3.25 | 40.17 | | |
| LveWO-Hrly | | | 12.360000 | 29.25 | 361.53- | | |
| Life Imp | | | | | 20.00 | | |
| Sales Ince | 04/10/2015 | 04/23/2015 | | | 1.03 | | |
| Meal Pnlty | | | 18.540000 | 1.00 | 18.54 | | |
| Pers-Hrly | | | | | 0.00 | | |
| Hol-Hrly | | | | | 0.00 | | |
| Other | | | | | 0.00 | | |
| **Total:** | | | | 114.54 | 744.03 | | |

## TAXES

| Description | Current | YTD |
|---|---|---|
| Fed Withholdng | 27.46 | |
| Fed MED/EE | 8.44 | |
| Fed OASDI/EE | 36.07 | |
| CA Withholdng | 4.71 | |
| CA SDI FTDI | 5.24 | |
| **Total:** | 81.92 | |

## BEFORE-TAX DEDUCTIONS

| Description | Current | YTD |
|---|---|---|
| Dental Before-Tax | 1.12 | |
| FSA Health Care | 38.46 | |
| Medical Before-Tax | 118.35 | |
| Vision Before-Tax | 5.22 | |
| **Total:** | 163.15 | |

## AFTER-TAX DEDUCTIONS

| Description | Current | YTD |
|---|---|---|
| Dependent Life After-Tax | 0.48 | |
| Optional Emp Life After-Tax | 3.80 | |
| Opt Spouse Life After-Tax | 2.38 | |
| **Total:** | 6.66 | |

## OTHER BENEFITS

| Description | Current | YTD |
|---|---|---|
| | | |

\* Taxable

| | TOTAL GROSS | FED TAXABLE GROSS | TOTAL TAXES | TOTAL DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Current: | 744.03 | 581.91 | 81.92 | 169.81 | 492.30 |
| YTD: | | | | | |

| | | NET PAY DISTRIBUTION | |
|---|---|---|---|
| | | Advice #000000021693162 | 492.30 |
| | | Total: | 492.30 |

---

**TWC Administration LLC**
60 Columbus Circle
New York, NY 10023

**Date**
05/14/2015

**Advice No.**
21693162

**Deposit Amount:** $492.30

To The
Account(s) Of

Acct: 1806-31-150-0000-SH30 HOME
JESSICA J HUENEBERG
10540 La Morada Dr
San Diego, CA 92124-1014

| DIRECT DEPOSIT DISTRIBUTION | | |
|---|---|---|
| Account Type | Account Number | Deposit Amount |
| Checking | xxxxxx5496 | 492.30 |
| Total: | | 492.30 |

**NON-NEGOTIA**



EXHIBIT 9 - PAGE 131

TWC000145

# EXHIBIT 10



## TIME KEEPING POLICY ACKNOWLEDGEMENT

Time Warner Cable employees use an electronic timecard system (Kronos) to track their time worked and time off. The actual method of accessing this system (personal computer, telephone, etc.) varies depending upon the department and employee location. All hours worked, benefit and leave time must be accurately reflected on the timecard.

The electronic timecard must be approved at the end of each pay period by both the employee and the supervisor. The "electronic signature" in Kronos acts the same as a written signature, and it indicates that both the employee and the supervisor know what time is entered on the timecard and acknowledge that the time entered is correct. An incorrect timecard should never be approved.

Additionally, Time Warner Cable has a strict time keeping policy regarding nonexempt (hourly) employees. All employees are to take paid rest breaks, 15 minutes for each four hours of work. Employees must also take an unpaid lunch break of 60 minutes during each shift of six hours or more. Employees are never to "punch out" and keep working (otherwise known as "working off the clock"). Working off the clock is strictly prohibited.

Misrepresentation of hours worked, forgery, or other tampering with these records is a violation of the law and any employee found to have engaged in this behavior will be subject to corrective action, up to and including termination of employment.

By signing the below, I acknowledge that I understand Time Warner Cable's Time Keeping Policy. I understand that:

1.  I am responsible for monitoring my timecard and keeping it up-to-date during each pay period.
2.  I acknowledge that I must take scheduled breaks.
3.  I acknowledge that I must approve my timecard at the end of every pay period.
4.  I further acknowledge that I must request timecard corrections in writing from my supervisor within one pay period of the date of an error or the date that an error was first noticed.

_Jessica Hueneberg_                          _6·30·14_

Employee Signature                              Date

_Jessica Hueneberg_                          _6·30·14_

Print Employee Name                             Date

_1200916_

Location                              PS ID #

Δ π EXHIBIT __9__
Deponent _Hueneber_
Date _5·7·17_ Rptr: _BAR_
WWW.DEPOBOOK.COM

Rev. 02/05/2008, 11/6/13

TWC000003

# EXHIBIT 11

EXHIBIT 11 - PAGE 134

**From:** Ridge, Christina
**Sent:** Wednesday, June 01, 2016 3:28 PM
**To:** Ridge, Christina <christina.ridge@twcable.com>
**Subject:** Labor Law Compliance

| | |
|---|---|
| Coach Name: | Christina M Ridge |
| Employee Name: | Jessica J Hueneberg |
| | Jessica Hueneberg, Title: Agent, E-ID: E208969 |
| Date: | April 09, 2016 |
| Coaching Session Type: * | Coaching |
| Example Date: | [no date] |

Session Focus ⓘ

| | |
|---|---|
| Coaching Topic: | Compliance |

Current Performance ⓘ

| | |
|---|---|
| Cycle: | April 2016 |
| Cycle Performance: | |

| FCR | CSAT | Internal Productivity | PSU Yield |
|---|---|---|---|
| 79.27 % | 99 % | 86.76 % | 2.16 % |

| Dispatch Rate | Transfer | AHT | Monthly Recurring Revenue |
|---|---|---|---|

1

Δ π EXHIBIT 10
Deponent *Huendes*
Date *5-17-17* *BAB*
WWW.DEPOBOOK.COM

| 11.11 % | 8.42 % | 634 sec. | $ 368.39 |
|---|---|---|---|
| Ownership | Communication | Call Control | Proactive/Future Value |
| - | - | - | - |
| Define & Confirm Issue | Knowledge & Effective Use of Tools | Fluidly Identify Additional Products and Service Needs | Position Value Tied to Additional Needs |
| - | - | - | - |
| Ask for the Sale | | | |
| - | | | |

Other Metric 1: [no value entered]   Value: [no value entered]

Other Metric 2: [no value entered]   Value: [no value entered]

Feedback ⓘ

Strengths:

Opportunities:

Action Items:     We have had many conversations about needing be off the floor when not scheduled to be working.  You are not permitted to work outside of scheduled shift when you are not being paid for that time, nor are you permitted to work during your break, nor are you permitted to work during your lunch.  Additionally, you must take your breaks and lunch away from the call center floor or any of the call centers labs - there are designated computer stations around the building which you can browse the internet from, but not from your work desk.
Appreciate you wanting to be early and ready to go at your scheduled start of shift, however, not when you are not being paid.  Employees, if they want to arrive before their scheduled start of shift, may utilize Kronos manual timestamp up to 5 minutes before their scheduled start of shift to load tools.
Your cooperation and compliance with this and other TWC policy is required - thanks

Coaching Support Materials and Employee Follow-Up Tasks ⓘ

Assigned Tasks:     Item          Detail          Resource          Due Date
                                                              [Empty]

Coach Follow-up Tasks ⓘ

Assigned Tasks:     Summary               Detail          Due Date
                                                  [Empty]

Time Spent Coaching ⓘ

Minutes Preparing:     5

Coaching Minutes Coached:     1

2

Minutes Coached: *          1

Employee Acknowledgment (i)

Comments:          I was told by Christina to get off the floor at about 7:00, I had my tools pulled up but was on a non-work website. She told me that she had repeatedly told me not to work off the clock and that I should not be at my work desk until five minutes before my shift. Later during the day during another conversation she elaborated that I should not be at my desk until five minutes until my start time and am allowed to log in via Kronos while my computer programs load. I let her know that I enjoy arriving to work early for multiple reasons and like to prepare my work area, prepare my mind, and prepare my tools for work to be in a calm and positive mindset before I start taking calls. I was told that I would need to stay off the floor no matter the situation until 5 minutes before my start time. I just want to whoever reads this to know that I have been told the opposite about logging in through Kronos (being told that we can only clock in through Avaya (unless there are mitigating circumstances) and hope that if I do clock in through Kronos that I will not be reprimanded. I understand that if my computer takes longer to load I can email my supervisor to adjust my time; however I feel that 5 minute allotment time to clock in will result in many emails to adjust my timecard and will result in unnecessary work for my supervisor. My early arrival has not been to work off the clock- it has been a way to ensure I start work on time and set myself in a mindset that is beneficial to customers.

Due Date:                     April 10, 2016

Submitted By Coach:          April 09, 2016 7:48 AM

Acknowledged By Agent:       April 10, 2016 11:12 AM




Coach Name:                  Christina M Ridge

Employee Name:               Christian Joaquin

                             Christian Joaquin, Title: Agent, E-ID: E219267

Date:                        April 09, 2016

Coaching Session Type: *      Coaching

Example Date:                [no date]


Session Focus (i)

Coaching Topic:              Compliance


Current Performance (i)

Cycle:                       April 2016

Cycle Performance:

| FCR | CSAT | Internal Productivity | PSU Yield |
|-----|------|----------------------|-----------|
| 74.21 % | 88.16 % | 89.35 % | 1.31 % |

3

# EXHIBIT 12

EXHIBIT 12 - PAGE 138

From: Ridge, Christina
Sent: Thursday, April 21, 2016 9:32 AM
To: Amon, Robert <scott.amon@twcable.com>; Arroyo, Arturo <arturo.arroyo@twcable.com>; Burger, Jeny
<jeny.burger@twcable.com>; Diaz, Martin <martin.diaz@twcable.com>; Fletcher, Gary <gary.fletcher@twcable.com>;
Fortanas, Todd <todd.fortanas@twcable.com>; Gomez2, Carlos <carlos.gomez2@twcable.com>; Lowe, Tashenna
<tashenna.lowe@twcable.com>; Ortiz, Elisha <elisha.ortiz@twcable.com>; Ridge, Christina
<christina.ridge@twcable.com>; Riporti, Joseph <joseph.riporti@twcable.com>; Starks, Anthony
<anthony.starks@twcable.com>; Tinsley, Brittannii <brittannii.tinsley@twcable.com>
Subject: FW: Important Policy Reminder
Importance: High

Greetings Team!

Below is a reminder from our manager Ron Collazo about taking breaks & lunches away from your desk and off of the
floor.

Additionally, no working off the clock! (Who would want to work and not get paid for that time anyways?!) If you like to
load your tools before your scheduled shift you are allowed to manually clock in using Kronos up to 5 minutes before
your scheduled start of shift – keep in mind that once your scheduled shift starts you should log in to Avaya and
immediately begin taking calls.

Not to worry if you don't show up early, we don't require it! Just make sure that you log in to Avaya at your scheduled
start of shift, launch AAD & immediately begin taking calls -  You can load additional tools as you go.

Thanks!
Christina

From: Collazo, Ronald
Sent: Friday, April 01, 2016 8:45 AM
Importance: High

Good Morning,


Please make sure your Agents/non-Exempt Employees are taking their lunch and
breaks AWAY from their desks and OFF of the floor. Also, please make sure your
Agents are NOT using time 'off of the clock' prior to their shift loading tools.

Both constitute 'working off of the clock" and are considered labor law violations.
Our policies have been in place for over a decade and are intended to protect our
Employees and TWC from inadvertent labor violations and potential workers comp
injuries and lawsuits.

7

Δ π EXHIBIT 11
Deponent Hueneber
Date 5-17-17 Rptr. BAB
WWW.DEPOBOOK.COM

It's your duty as People Leaders to enforce these longstanding policies and encourage your Agents to enjoy their well-deserved downtime away from the call center floor. Please feel free to reach out to me and/or Human Resources with any related questions or concerns.

Thanks,

**Ron** Collazo | Manager, Customer Care | San Diego, CA
O: 858.805.7193 | E: Ronald.Collazo@twcable.com

**From:** Ridge, Christina
**Sent:** Saturday, April 02, 2016 2:19 PM
**To:** Arroyo, Arturo <arturo.arroyo@twcable.com>; Bunche, Taurein <taurein.bunche@twcable.com>; Cummings1, Kyle <kyle.cummings1@twcable.com>; Guel, Sueann <sueann.guel@twcable.com>; Hueneberg, Jessica <jessica.hueneberg@twcable.com>; Hurd, Mahlia <mahlia.hurd@twcable.com>; Joaquin, Christian <christian.joaquin@twcable.com>; John, Breana <breana.john@twcable.com>; Lamberth, Myjalie <myjalie.lamberth@twcable.com>; Luna, Lucia <lucia.luna@twcable.com>; May1, Michael <michael.may1@twcable.com>; Ridge, Christina <christina.ridge@twcable.com>; Schumaker, Nicole <nicole.schumaker@twcable.com>; Starks, Anthony <anthony.starks@twcable.com>
**Subject:** FW: Important Policy Reminder
**Importance:** High

Good Morning,

Please make sure your Agents are taking their lunch and breaks AWAY from their desks and off of the floor.

Thanks,

Ron Collazo | Manager, Customer Care | San Diego, CA
O: 858.805.7193 | E: Ronald.Collazo@twcable.com

8

# EXHIBIT 13

EXHIBIT 13 - PAGE 141

*CARMEN FULLER, et al vs.*
*TWC ADMINISTRATION, LLC, et al*

---

*MATTHEW LUTACK*
*December 18, 2018*

---



ELLEN GRAUER
COURT REPORTING CO. LLC

126 East 56th Street, Fifth Floor  New York, New York 10022
P: 212-750-6434   F: 212-750-1097
www.ellengrauer.com

*Original File 255578.txt*
*Min-U-Script® with Word Index*

EXHIBIT 13 - PAGE 142

1   IN THE UNITED STATES DISTRICT COURT

2   FOR THE SOUTHERN DISTRICT OF CALIFORNIA
    --------------------------------------------------x
3   CARMEN FULLER, an individual, LAURENCE GIBBS,
    an individual, Et Al.,
4
                        Plaintiffs,
5
        -vs.-
6
    TWC ADMINISTRATION, LLC, a Delaware Limited
7   Liability Company and DOES 1 through 10,
    inclusive,
8
                        Defendants.
9
    Case No. 3:17-cv-01513-DMS-AGS
10  --------------------------------------------------x

11

12                      1230 Columbia Street
                        San Diego, California
13
                        December 18, 2018
14                      9:59 a.m.

15

16      VIDEOTAPED DEPOSITION OF MATTHEW LUTACK,

17   taken before RENEE K. PAPIERNIAK, a Certified

18   Shorthand Reporter.

19

20

21

22

23          ELLEN GRAUER COURT REPORTING CO., LLC
               126 East 56th Street, Fifth Floor
24               New York, New York 10022
                       212-750-6434
25                     REF:  255578

EXHIBIT 13 - PAGE 143

```
 1   A P P E A R A N C E S:

 2

 3   THE MARKHAM LAW FIRM

 4   Attorneys For Plaintiffs:

 5        750 B Street, Suite 1950

 6        San Diego, California  92101

 7   BY:  MICHAEL MORPHEW

 8        619.615.2067

 9        mmorphew@markham-law.com

10

11

12   KABAT CHAPMAN & OZMER, LLP

13   Attorneys For Defendant TWC Administration, LLC:

14        171 17th Street NW, Suite 1550

15        Atlanta, Georgia  30363

16   BY:  JOSEPH W. OZMER II

17        SHAWNA M. MILLER

18        404.400.7300

19        jozmer@kcozlaw.com

20        smiller@kcozlaw.com

21

22

23

24

25
```

EXHIBIT 13 - PAGE 144

```
 1   A P P E A R A N C E S: (Cont'd)

 2

 3   KABAT CHAPMAN & OZMER, LLP

 4   Attorneys For Defendant TWC Administration, LLC:

 5        515 South Flower Street, 18th Floor

 6        Los Angeles, California  90071

 7   BY:  J. SCOTT CARR

 8        213.493.3980

 9        scarr@kcozlaw.com

10

11

12   ALSO PRESENT:

13        DESIREE PERI In-House Counsel Charter

14                   Communications (Telephonically)

15        MICHAEL DUARTE, Videographer

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT 13 - PAGE 145

1        Q.  So you never -- you never went to HR to talk

2    about any of the issues that are part of this lawsuit?

3    Am I correct about that?

4        A.  Oh, yes, that's correct.  I have never gone to

5    HR, no.

6        Q.  All right.  And you never went to one of your

7    managers to talk about any of the issues for the

8    compensation that you're seeking in this lawsuit.  Is

9    that correct?

10        A.  One-on-one, no.  In a meeting -- in an open

11    meeting, yes.

12        Q.  Well, I was asking you about what you said at

13    open meetings and you said it was just concerns about how

14    departments were treating customers and causing issues.

15    Are you now saying that you raised some of the things

16    that are issues in this lawsuit at a meeting?

17        A.  Yes.  I'm sorry.  I apologize.

18        Q.  Okay.  And what specifically did you raise in a

19    meeting?

20        A.  Boot-up time.

21        Q.  When was this meeting?

22        A.  2- -- let's see, 2015.

23        Q.  Okay.

24        A.  I think it was -- I can't remember the exact

25    date.  But yeah, I think it was 2015.

EXHIBIT 13 - PAGE 146

1      A.  No, not that I recall.  I'd actually have to

2   look it up.

3      Q.  What was the reasons for any of leaves during

4   that time frame, if you recall?

5      A.  It was medical.

6      Q.  And what were the dates that you worked from

7   home as a home agent for Time Warner Cable?

8      A.  Almost the last four years.  So I'd say from --

9   well, 2013 through 2016.

10     Q.  So for the whole time relevant to this suit, you

11  were a home agent?

12     A.  That's correct.

13     Q.  What other things were different about being a

14  home agent than an office agent, other than the things

15  we've already talked about?  Having a VPN, having it take

16  slightly longer to load programs.  What else -- what else

17  was different?

18     A.  It was quicker to take a bathroom break.

19     Q.  At home?

20     A.  Yeah.  And it was, of course, easier to get to

21  work on time.

22     Q.  I imagine so.  It's a matter of going to a --

23  moving to the next room.  Correct?

24     A.  Eating better, healthier.

25     Q.  Did you -- do you know if you received different

EXHIBIT 13 - PAGE 147

```
 1   load.  And I would sit at the computer because sometimes
 2   it would be quicker, sometimes it -- I don't know when
 3   it's going to come up.
 4        Q.  Right.  So my question is, what time would
 5   you -- let's say for your shift when you started at 3
 6   o'clock.  What time would you sit down at your computer
 7   to bring up ACSR and any other programs you were going to
 8   bring up prior to your shift start?  What time would you
 9   sit down to do that?
10        A.  The latest I would start is a quarter till the
11   time I am supposed to start, 15 minutes.  That would be
12   about the quickest I could do it.  Make sure everything
13   was up and ready before I took my first call.
14        Q.  All right.  And when you would log into Avaya,
15   it would -- automatically, it would put you in an AUX
16   code which when you -- when you logged in, you were
17   automatically in an AUX code so that you would not
18   receive calls.  Correct?
19        A.  That's correct.
20        Q.  And you would -- in order to start receiving
21   calls, you had to go click on "Available" and make
22   yourself available to take calls in Avaya.  Is that
23   correct?
24        A.  That's correct.
25        Q.  And then Avaya had -- we talked some about AUX
```

EXHIBIT 13 - PAGE 148

1  codes.  It had an AUX code that you could enter for your
2  rest break.  Is that correct?
3       A.  That's correct.
4       Q.  And if your -- as -- when you would be on a call
5  as your rest -- scheduled rest break time was starting to
6  approach, you're supposed to click on that rest break
7  button so that when you finish that call, you'll --
8  you'll be in rest break and no further calls come in.  Is
9  that right?
10       A.  That's correct.
11       Q.  And same with your lunch break, as you're
12  getting near your lunch break time, you're in the middle
13  of a call, you go ahead and you click on the lunch break
14  AUX code.  It will prevent further calls from coming in
15  after that call is done so you can go take your break.
16  Correct?
17       A.  That's correct.
18       Q.  All right.  And then you were supposed to take
19  your break as soon as that call was over?
20       A.  That's right.
21       Q.  Um, with respect to lunch, one thing I want to
22  understand about Avaya, would you have to manually clock
23  out and in -- for Kronos, would you have to manually do
24  that for lunch, or would Avaya also do your lunch punches
25  for you when you clicked the lunch code?

EXHIBIT 13 - PAGE 149

1       A.   Avaya would do it.

2       Q.   Okay.  When you were loading your programs in

3   the morning, did you load them simultaneously, or did you

4   load them one at a time?

5       A.   It would have to be one at a time.

6       Q.   And why did it have to be one at a time?

7       A.   I was VPN into a server and it would bog if I

8   tried to do -- I'm sure there is probably smaller ones I

9   could do at the same time, but it -- if you had an issue,

10  you'd be starting over again, so it's better not to.

11      Q.   If you worked the -- once a month when you

12  worked out of the office, could you load them

13  simultaneously?

14      A.   I don't remember doing it there either.  It was

15  usually one thing at a time.

16      Q.   Okay.  When you were doing it at the office, why

17  would you do one thing at a time at the office?  Just

18  because that was your regular routine, because that's

19  what you did every day at home?

20      A.   No.  Because that's how I started, was in the

21  office, doing it one at a time.

22           (Exhibit No. 23 marked.)

23  BY MR. OZMER:

24      Q.   Mark this as the next exhibit, please.  I think

25  we're up to 23.  All right.  I'm handing you what's been

EXHIBIT 13 - PAGE 150

1   marked as Exhibit 23.  And you see where that says

2   "Timekeeping Policy Acknowledgement" on this form?

3       A.  Yes.

4       Q.  And you see at the bottom where it has a place

5   for employee signature and employee name?

6       A.  Yes.

7       Q.  Did you receive and execute a form like this

8   when you started your employment with Time Warner

9   Cable?

10      A.  Yes.

11      Q.  All right.

12      A.  Yes.  Most likely, yes.

13      Q.  And --

14      A.  I can't say for sure.  It does look somewhat

15  familiar.

16      Q.  Okay.  And that's what I was going to say.  It

17  looks familiar?

18      A.  Yeah.

19      Q.  But without seeing your signature on it, you're

20  not sure?

21      A.  Right.

22      Q.  In the end of the first paragraph it says --

23  last sentence -- I'm going to read it.  It says, "All

24  hours worked, benefit and leave time, must be accurately

25  reflected on the timecard."  Did I read that correctly?

EXHIBIT 13 - PAGE 151

1    Q.  And in the last sentence it says, "An incorrect
2    timecard should never be approved."  Did you understand
3    that you were not supposed to approve a timecard that was
4    not correct?
5    A.  Yes.
6    Q.  And the next sentence -- first sentence of the
7    third paragraph says, "Additionally, Time Warner Cable
8    has a strict timekeeping policy regarding nonexempt
9    hourly employees.  All employees are to take paid rest
10   breaks 15 minutes for each four hours of work.  Employees
11   must take an unpaid lunch break, 60 minutes, during each
12   shift of six hours or more.  Employees are never to punch
13   out and keep working, otherwise known as working off the
14   clock.  Working off the clock is strictly prohibited."
15   Did I read that paragraph correctly?
16   A.  Yes.
17   Q.  Did you understand, from the start of your
18   employment with Time Warner Cable thereon, that the --
19   working off the clock was strictly prohibited by the
20   company's policies?
21   A.  Yes.
22   Q.  Okay.
23   A.  That -- that's what the contention was
24   exactly.
25   Q.  And did you understand that those -- the meal

EXHIBIT 13 - PAGE 152

1    and rest break policies that I read in that paragraph,

2    although we're not talking about that right now.  Did you

3    understand that those were the company's policies?

4         A.  Yes.

5         Q.  Are you making any complaints in this case about

6    your meal or rest breaks, or is it -- when I asked you

7    earlier, you said it was to recover unpaid compensation.

8    Are you complaining about your meal or rest breaks at

9    all?

10        A.  No, not me.

11        Q.  Okay.  Not you?

12        A.  I mean, I don't know of any times that that was

13   an issue for me.

14        Q.  Okay.

15        A.  Or that I recall.

16        Q.  Well, the -- I guess the company -- just to

17   cover some of the basics on this.  The company scheduled

18   your meal and rest breaks for you.  Correct?

19        A.  Yes.

20        Q.  And they would typically --

21        A.  Between '13 and '16.

22        Q.  Yes.  Thank you.

23        A.  Okay.

24        Q.  And they would typically schedule you to have a

25   rest break sometime around the first two hours of your

EXHIBIT 13 - PAGE 153

1          "Company policy requires that all nonexempt

2    hourly employees are paid all time worked on behalf of

3    the company, including any overtime worked.  Submitting

4    or approving a timecard that does not contain a complete

5    and accurate record of all time worked is strictly

6    prohibited"  Did I read that correctly?

7          A.  Yes.

8          Q.  And that's very similar to the language we saw

9    on the timekeeping policy acknowledgment that we looked

10   at as Exhibit 23.  Is that right?

11         A.  Yes.

12         Q.  And you understood -- that first paragraph, you

13   understood that to be the policy of the company.

14   Correct?

15         A.  Yes.

16         Q.  In the second paragraph it says -- I'll read the

17   first sentence.  "You are responsible for insuring that

18   your time submitted in Kronos, TWC's timekeeping system,

19   is accurate."  Did I read that correctly?

20         A.  Yes.

21         Q.  And that sentence is in bold font.  Correct?

22         A.  Right.

23         Q.  And you understood that the company's policy was

24   that you were supposed to make sure your Kronos time

25   accurately reflected all hours worked.  Right?

EXHIBIT 13 - PAGE 154

1        A.   Yes.

2        Q.   The next sentence says, "You must be clocked

3   into Kronos prior to performing work."   And I'll stop

4   there.   Did I read that part of the sentence correctly?

5        A.   Yes.

6        Q.   And you understood that that was the company's

7   policy, that they wanted you to be on the clock before

8   you started doing any work.   Correct?

9        A.   Correct.

10       Q.   And then it says, "You should not clock out of

11  Kronos until you've completed your work for the day."

12  Did you understand that to be the company's policy?

13       A.   Yes.

14       Q.   And it also says, "In addition, you should not

15  perform any work during meal or rest breaks."   Right?

16       A.   Right.

17       Q.   And you're not claiming in this case that you

18  performed any work during meal or rest breaks, are you?

19       A.   No.

20       Q.   And then it says -- in the first sentence of the

21  third paragraph it says, again, "Off the clock work is

22  strictly prohibited."   Did I say that correctly?

23       A.   Yes.

24       Q.   And that's the same language we saw in the

25  timekeeping policy acknowledgment that you would have

EXHIBIT 13 - PAGE 155

1    received at the beginning of your employment?

2         A.   Yeah.

3         Q.   If you turn over to the next page, this

4    timekeeping slide that would have been covered in your

5    orientation, it says, "In addition to core job functions,

6    work time includes the following."  And then if you go

7    down to the fifth bullet --

8         A.   Oh, wait a minute.  I might be on the wrong page

9    here.

10        Q.   Page 58.

11        A.   Page 58.

12        Q.   I can help you if you want to --

13        A.   Here we go.  I think I have got it now.  Okay.

14   I have got you.

15        Q.   Sure.  And I'll start over.  It says, "In

16   addition to core job functions, work time includes the

17   following."  And then if you go down to the fifth bullet

18   point down it says, "Logging into or out of computer

19   programs or software applications (e.g., billing, sales

20   tracking, issue tracking, or other computer programs)."

21   Did I read that correctly?

22        A.   Yes.

23        Q.   And you understood the policy of the company was

24   that they considered that work that should be recorded,

25   logging into and out of your computer programs and

EXHIBIT 13 - PAGE 156

1    software applications.  Right?

2        A.  Yes.

3        Q.  And nobody ever told you that TWC's policy was

4    the opposite of this, that TWC did not pay for the time

5    it took to log into or out of computer programs or

6    software applications, did they?

7        A.  Those weren't the words that were used, no.

8        Q.  All right.  And then it says, "Should you have

9    any questions about the timekeeping policy, please

10   contact your local human resources business partner."

11   Correct?

12       A.  Yes, I see that.

13       Q.  And earlier you told me that you never spoke to

14   human resources about any of the off the clock work

15   issues you're claiming in this case.  Right?

16           MR. MORPHEW:  Objection.  Misstates prior

17   testimony.

18           THE WITNESS:  Not that I can recall

19   specifically.

20           MR. OZMER:  All right.  Why don't -- we only

21   have a couple of minutes left on the tape.  Let me -- let

22   me ask you just briefly.

23       Q.  Did you -- you also -- when you started your

24   employment, you would have received a copy of the

25   employee handbook?

EXHIBIT 13 - PAGE 157

1    break and ready to resume your deposition.  Are you ready

2    to resume your deposition?

3         A.  Yes.

4         Q.  All right.  During the -- during the lunch

5    break, did you talk to anybody about your testimony?

6         A.  No.

7         Q.  The -- we were talking earlier about -- and we

8    looked at some policies that talked about you needing to

9    approve your timecard every pay period.  Correct?

10        A.  That's right.

11        Q.  And you understood that that was a company

12   requirement, that you approve your timecard to ensure it

13   was accurate every pay period?

14        A.  Yes.

15        Q.  And if you noticed any errors or inaccuracies,

16   you were supposed to e-mail your supervisor to advise him

17   so that he could correct your timecard?

18        A.  That's correct.

19        Q.  Him or her.  Correct?

20        A.  That's right.

21        Q.  And the -- and from time to time you would do

22   that, you would e-mail your supervisor with a timecard

23   correction.  Right?

24        A.  That's correct.

25        Q.  And they would make the correction to ensure

EXHIBIT 13 - PAGE 158

```
 1   that you were paid for any unrecorded time that you
 2   advised them of.  Correct?
 3        A.  That's right.
 4        Q.  Are you aware of any occasion where you ever
 5   asked for a timecard correction that the supervisor
 6   failed to make?
 7        A.  Yes.
 8        Q.  Any occasion between 2013 and 2016 where you
 9   asked for a correction that the supervisor failed to
10   make?
11        A.  Yes.  I think it was finally cleared up.  But,
12   yeah, at the time it wasn't being -- you know.
13        Q.  Well --
14        A.  Yeah.
15        Q.  -- let me short circuit this.  You said you
16   think "It was finally cleared up."  Was there an
17   initial -- go ahead.
18        A.  I -- I'm not sure.
19        Q.  Okay.
20        A.  I'm not sure.
21        Q.  Do you think there was -- were you thinking that
22   there may have been an occasion where there was an
23   initial discrepancy that didn't initially get fixed, but
24   it ultimately got fixed?
25        A.  Yeah.
```

EXHIBIT 13 - PAGE 159

```
 1        Q.  Okay.  Are you aware of any time -- occasion
 2   where you reported unrecorded time to your supervisor
 3   that you were not ultimately paid for?
 4        A.  No, not that I recall.
 5        Q.  And if you were having a computer problem that
 6   was causing -- delaying you in being able to get on the
 7   clock in the morning, that was one of the things that you
 8   were supposed to notify your supervisor about, so he
 9   could fix that for you.  Right?
10            MR. MORPHEW:  Objection.  Incomplete
11   hypothetical.
12            THE WITNESS:  If I had any issues prior to the
13   start of my shift, the supervisor needed to know, yes.
14   BY MR. OZMER:
15        Q.  All right.  Let's mark this -- well, I'll give
16   you what's been previously marked as Exhibit 11 in this
17   case.
18        A.  Okay.
19        Q.  Do you recall a supervisor named Christina
20   Ridge?
21        A.  Yes -- well, no, not Ridge.  I remember a
22   Christina.  I don't recall her last name.
23        Q.  Okay.  So it could have been and -- but she was
24   a supervisor?
25        A.  Right.  She wasn't one of my supervisors.
```

EXHIBIT 13 - PAGE 160

1        A.  Yes.

2        Q.  So would you agree with me that Mr. Collazo here

3   is instructing supervisors to make sure agents are not

4   working off the clock prior to their shift loading tools.

5   Correct?

6            MR. MORPHEW:  Objection.  Calls for

7   speculation.

8   BY MR. OZMER:

9        Q.  Is that how you read the document?

10       A.  When I read that's -- that's what it seems to

11   say to me, yes.

12       Q.  And that's what your complaint is in this case,

13   is that you were -- that you were doing the opposite of

14   this, you were loading programs off the clock prior to

15   your shift.  Is that right?

16       A.  That's correct.

17       Q.  And as we saw earlier, you understand that doing

18   that was contrary to Time Warner Cable's company policy,

19   based on the written documents we looked at earlier.

20   Correct?

21       A.  As far as what's in writing, that's correct.

22       Q.  And you can see from this e-mail that it's also

23   contrary to the policies and practices that Mr. Collazo

24   wanted in place at the call center.  Correct?

25            MR. MORPHEW:  Objection.  Calls for

EXHIBIT 13 - PAGE 161

1    speculation.

2         THE WITNESS:  Yeah, I couldn't answer that.  Um,

3    from what I'm reading here, that's what it seems like

4    he's interjecting.

5    BY MR. OZMER:

6         Q.  Okay.  And if you go up -- let's look at the

7    second paragraph from Ms. Ridge when she passes this on

8    to her team.  She says, "Additionally, no working off the

9    clock.  Who would want to work and not get paid for that

10   time anyway."  Did I read that correctly?

11        A.  Yes.

12        Q.  And then she says, "if you would like to load

13   your tools before your scheduled shift, you are allowed

14   to manually clock in using Kronos up to five minutes

15   before your shift" -- "scheduled start of shift."  Did I

16   read that correctly?

17        A.  Yes.

18        Q.  And were you aware that you could manually clock

19   into Kronos up to five minutes prior to the start of your

20   shift?

21        A.  Yes.

22        Q.  Okay.  Did you ever do that in order to be on

23   the clock when you were loading programs?

24        A.  Not since they brought in Avaya.

25        Q.  Okay.  But this is -- April of 2016, they had

EXHIBIT 13 - PAGE 162

1      Q.  All right.  And how many times did that

2  happen?

3      A.  It wasn't needed very often, so only a couple of

4  times.

5      Q.  But your testimony is that the supervisors, at

6  least, believed that you could log in manually on Kronos

7  and tried to show you how to do it but couldn't get the

8  computer to do it on the occasion where they tried to

9  show you?

10     A.  Not all of them believe that.

11     Q.  Okay.  And so where Ms. Ridge and Mr. Collazo

12  say "No working off the clock" -- you had supervisors

13  that told you that you weren't allowed to work off the

14  clock, didn't you?

15     A.  Yes.

16     Q.  Which supervisors told you that you were not

17  allowed to work off the clock?

18     A.  All of them.

19     Q.  All of them told you that?

20     A.  Yes.

21     Q.  Okay.  And in her third paragraph Ms.

22  Ridge says, and I'll read this, "Not to worry, if you

23  show up" -- strike that.

24          She says, "Not to worry, if you don't show up

25  early, we don't require it."  Did I read that

EXHIBIT 13 - PAGE 163

1    correctly?

2         A.  Yes.

3         Q.  And she says, "Just make sure that you log into

4    Avaya at your scheduled start of shift, launch AAD, and

5    immediately begin taking calls.  You can load additional

6    tools as you go."  Did I read that correctly?

7         A.  Yes.

8         Q.  Were you aware that you could just log into

9    Avaya at the start of your shift, get clocked in, start

10   AAD, then start taking calls and load the tools as you

11   were on your first call or if you even had a call at the

12   start of your shift?  Were you aware you could do that?

13        A.  Right.  Yeah.

14        Q.  Did you ever follow that practice?

15        A.  Yes.

16        Q.  What would cause you to follow that practice

17   where you would load Avaya first, get yourself clocked

18   in, then load AAD and start taking calls, if they were

19   coming in, and load programs as you were going, what

20   would cause you to do that, instead of loading your

21   programs off the clock?

22        A.  Only two times did I ever do it, and it failed.

23   Failed miserably.

24        Q.  How did it fail miserably?

25        A.  The first call was a tech call --

EXHIBIT 13 - PAGE 164

1          A.   No, it's part of training.

2          Q.   Part of training you received in 2009?

3          A.   Yeah.  As far as in writing, I'm not sure.  I

4     know there was -- we can't use technical language.  I

5     don't know if that's in writing.  I'm trying to think of

6     some of the training manuals, how they had that.  Yeah,

7     you couldn't use jargon, things like that.

8          Q.   And then if you followed this procedure that

9     she's recommending, she's saying -- well, let me -- she's

10    saying one thing you can do is you can clock in five

11    minutes early and then start loading your programs while

12    you're on the clock.  You see that she's saying that.

13    Correct?

14         A.   Yes.

15         Q.   And you knew you were allowed -- even if you

16    didn't know about the five minutes early, you knew you

17    were allowed to go ahead and clock in first and then load

18    your programs if that was the way that you chose to do

19    it.  Correct?

20              MR. MORPHEW:  Objection.  Misstates prior

21    testimony.

22              THE WITNESS:  Yeah.  That's not my

23    understanding, no.

24    BY MR. OZMER:

25         Q.   Okay.  Did you ever see anything -- any written

EXHIBIT 13 - PAGE 165

1   policy that said you were supposed to work off the clock

2   to load up your tools and programs?

3          A.  No.  Just -- right, not a written policy, no,

4   just --

5          Q.  And your -- the written policies said you're not

6   allowed to work off the clock under any circumstances.

7   Right?

8          A.  As far as I understand, what's here, yes.

9          Q.  Right.  And your supervisors reinforced that?

10  Supervisors and managers would tell agents "You're not

11  allowed to work off the clock."  Right?

12         A.  That's not something I heard a lot until

13  today.

14         Q.  Well, but you --

15         A.  At work, no, that's not something I heard a

16  lot.

17         Q.  You told me -- you testified under oath just a

18  minute ago that -- or a few minutes ago, that everyone of

19  your supervisors told you at some point or another that

20  you were not allowed to work off the clock.  Do you

21  recall that testimony?

22         A.  Yes.

23         Q.  Okay.  And that was truthful testimony.

24  Right?

25         A.  Yes.

EXHIBIT 13 - PAGE 166

118

```
 1        A.   All the time.
 2        Q.   Okay.  And they told you "You're not allowed to
 3   work off the clock."  Right?
 4        A.   No, not all the time.
 5        Q.   Okay.  Well, you testified earlier that every
 6   supervisor told you at some point or another not to work
 7   off the clock.  Right?
 8             MR. MORPHEW:   Objection.  Misstates prior
 9   testimony.
10             THE WITNESS:   It's not -- it's not the words
11   that they would use specifically.
12   BY MR. OZMER:
13        Q.   How did you go about telling any -- between 2013
14   and 2016, how did you go about telling any supervisor
15   that you were working off the clock?
16        A.   By the time it was taking me to load my
17   programs.
18        Q.   Okay.  Did you ever submit timecard corrections
19   asking to be compensated for that time?
20        A.   No.
21        Q.   Did you specifically tell them, "I'm doing this
22   before I'm clocking in" or did you just tell them that it
23   was taking you time to load your programs?
24        A.   Oh, yeah, I told them it was before I was
25   opening Avaya and clocking in.
```

EXHIBIT 13 - PAGE 167

1  supervisor "I am loading these programs off the clock"?

2      A.  Yes.

3      Q.  Okay.  You said the specific words, "I am doing

4  it without being clocked in"?

5      A.  Yes.

6      Q.  Okay.  What supervisor did you tell that you did

7  this without being clocked in?

8      A.  Every supervisor I have had.

9      Q.  And what was the responses that you got from

10  your supervisors when you told them that you were doing

11  this off the clock in violation of company policy?

12      A.  That I should find another way of doing that.

13  And that's what I -- the reason why we were having the

14  conversation.  What is another way of doing that.  And

15  that's where contention would start each time.

16      Q.  But other ways of doing it -- one of them would

17  be -- and I understand you had a problem with Kronos.

18  But one of them that is suggested in the e-mail is

19  loading -- logging in -- clocking in through Kronos

20  manually and then starting your programs and loading

21  Avaya at the start of your shift.  Right?

22      A.  Right.  But it still wouldn't work.  The reason

23  why I say it wouldn't work for me is because we're

24  supposed to be taking a call at the start of our shift,

25  within a couple of minutes.

EXHIBIT 13 - PAGE 168

123

1       A.   QC and all the supervisors, because that will

2   hit your quality control and it will hurt your metrics

3   and it's considered call avoidance.  And if you do that

4   enough times, you will be fired.  Exact quote of all

5   supervisors.  You can be fired for call avoidance.

6       Q.   For call avoidance.  Nobody said you would --

7   nobody said the words that you could be fired for

8   remaining in the AUX default log-in mode, while you

9   loaded your customer service programs, did they?  Nobody

10  said that, did they?

11      A.   Yes, they said that's considered call

12  avoidance.

13      Q.   No -- well, I'm asking you, did anyone say the

14  words to you you can be fired for staying in AUX default

15  mode while you load your programs?

16      A.   No.  They said that's considered call avoidance.

17  They didn't say it that way, no.

18      Q.   And so whenever -- whenever you told your -- a

19  supervisor that you had loaded programs off the clock,

20  they didn't say that's okay, they need to say, "You've

21  got to find another way to do that because you're not

22  supposed to work off the clock."  Right?

23      A.   Yes.

24           MR. MORPHEW:  Objection.  Misstates prior

25  testimony.

EXHIBIT 13 - PAGE 169

BY MR. OZMER:

Q.  And you don't recall submitting any time corrections for the times that you did do that.  Right?

A.  No, I did not.

Q.  Okay.  Can you give me any details about specific occasions where you had any of these discussions with your supervisors, who the supervisor was, what was the date?

A.  Yeah.  It was 2016, about a month before I was fired.  It was Tim Parker.  We had a heated discussion. It should have been taken into a conference room, but it ended up being right there on the call center floor.

Q.  Okay.

A.  And it was about metrics and the exact things we're talking about.  The only thing I know is he told me he agreed with everything I was saying.  But as a supervisor, he was held to a certain -- I don't know what was going on with that.  But the conversation ended with what -- after about 20 minutes of going around and around, he -- I finally said, "What do I have to do?  Do I have to get a lawyer in order to get this taken care of?"  And three weeks later, I didn't work there any more.

Q.  Well, I asked you earlier if you'd ever had any discussion with Tim Parker about the issues related to

EXHIBIT 13 - PAGE 170

126

1      You don't know whether it was the practice of

2  every other employee to do what you did or whether other

3  employees were doing exactly what Mr. Collazo and Ms.

4  Ridge are instructing in these e-mails and not using off

5  the clock time to load programs?  You don't know what

6  other people did.  Right?

7           MR. MORPHEW:  Objection.  Calls for

8  speculation.

9           THE WITNESS:  There are a few agents I might

10  know of that we've had conversations with.  But other

11  than that, no, I don't -- I can't tell you.  I couldn't

12  answer that.

13  BY MR. OZMER:

14      Q.  And you knew that working off the clock was a

15  violation of Time Warner Cable's policies.  Correct?

16  Based on the documents we looked at earlier?

17      A.  Yeah.

18      Q.  All right.  Why did you not complain to HR about

19  that as is instructed in the PowerPoint you received in

20  orientation on timekeeping?  Why did you not complain to

21  HR about any off the clock work you were doing?

22      A.  Um, I didn't know it was an avenue I could take.

23  The other thing is that HR kind of didn't exist.  You had

24  to do something through an e-mail or request a meeting.

25  It isn't like I could just go walk to HR and talk to

EXHIBIT 13 - PAGE 171

127

1    somebody.

2        Q.  You knew the open door policy existed.  Right?

3        A.  Yes.  And I went there several times and there

4    was nobody there.  Their offices were empty quite

5    often.

6        Q.  But you never sent an e-mail to anyone in HR to

7    complain about these policies.  Correct?

8        A.  Right.

9        Q.  Or working off the clock?

10       A.  I never went formally, yeah.  Informally I

11   tried, but no.

12       Q.  And you never spoke to one of your call center

13   managers about it either, did you?

14       A.  No, not directly.  It may have came up in a

15   meeting.  But no, as myself going to the open door

16   policy, no, I did not.

17       Q.  Walk me through -- what was the order in which

18   you typically would load programs in the morning, or was

19   there any set order?

20           MR. MORPHEW:  Objection.  Asked and answered.

21           THE WITNESS:  Yeah, that's true.  I would start

22   with ACSR because it took the longest to load.  And it

23   was the most important one to have up because it brought

24   the customer's ID, which is important so I wouldn't have

25   to walk them through their -- you know, getting every --

EXHIBIT 13 - PAGE 172

```
 1              C E R T I F I C A T E
 2         I, RENEE K. PAPIERNIAK, a Certified Shorthand
 3    Reporter, do hereby certify:
 4         That the foregoing proceedings were taken
 5    before me at the time and place therein set forth,
 6    At which time the witness was put under oath by me;
 7         That the testimony of the witness, the
 8    questions propounded, and all objections and statements
 9    made at the time of the examination were recorded
10    stenographically by me and were thereafter transcribed;
11         That a review of the transcript by the deponent
12    was requested:
13         That the foregoing is a true and correct
14    transcript of my shorthand notes so taken.
15         I further certify that I am not a relative or
16    employee of any attorney of the parties, nor financially
17    interested in the action.
18         I declare under penalty of perjury under the
19    laws of California that the foregoing is true and
20    correct.  Dated this 3rd day of January, 2019.
21
22
23    _Renee K. Papierniak_
24    _____
25    RENEE K. PAPIERNIAK, CSR NO. 7056
```

EXHIBIT 13 - PAGE 173

# EXHIBIT 14

EXHIBIT 14 - PAGE 174

 

DEPOSITION
EXHIBIT
23
Lutack

## TIME KEEPING POLICY ACKNOWLEDGEMENT

Time Warner Cable employees use an electronic timecard system (Kronos) to track their time worked and time off. The actual method of accessing this system (personal computer, telephone, etc.) varies depending upon the department and employee location. All hours worked, benefit and leave time must be accurately reflected on the timecard.

The electronic timecard must be approved at the end of each pay period by both the employee and the supervisor. The "electronic signature" in Kronos acts the same as a written signature, and it indicates that both the employee and the supervisor know what time is entered on the timecard and acknowledge that the time entered is correct. An incorrect timecard should never be approved.

Additionally, Time Warner Cable has a strict time keeping policy regarding nonexempt (hourly) employees. All employees are to take paid rest breaks, 15 minutes for each four hours of work. Employees must also take an unpaid lunch break of 60 minutes during each shift of six hours or more. Employees are never to "punch out" and keep working (otherwise known as "working off the clock"). Working off the clock is strictly prohibited.

Misrepresentation of hours worked, forgery, or other tampering with these records is a violation of the law and any employee found to have engaged in this behavior will be subject to corrective action, up to and including termination of employment.

**By signing the below, I acknowledge that I understand Time Warner Cable's Time Keeping Policy. I understand that:**

1. I am responsible for monitoring my timecard and keeping it up-to-date during each pay period.
2. I acknowledge that I must take scheduled breaks.
3. I acknowledge that I must approve my timecard at the end of every pay period.
4. I further acknowledge that I must request timecard corrections in writing from my supervisor within one pay period of the date of an error or the date that an error was first noticed.

_____     _____
Employee Signature                   Date

_____     _____
Print Employee Name                  Date

_____     _____
Location                             PS ID #

Rev. 02/05/2008, 11/6/13

CONFIDENTIAL                    TWC000264

EXHIBIT 14 - PAGE 175

# EXHIBIT 15

EXHIBIT 15 - PAGE 176

DEPOSITION
EXHIBIT
24


CONFIDENTIAL
TWC Employee Orientation
Our Policies
TWC+You
Work Better. Live Better.

## Our Policies

- Standards of Business Conduct (SBC)
- Open Door Policy
- Social Media Policy
- Non-solicitation Policy
- Timekeeping Policy
- Media/Press Policy
- Disclosure of Criminal Charges and Convictions Policy
- Employment of Relatives
- Corrective Action Policy

51

TWCA000132

EXHIBIT 15 - PAGE 178

## Standards of Business Conduct (SBC)

The Standards of Business Conduct govern how we conduct our business and reflect the commitment of Time Warner Cable and its directors, officers and employees to conduct business with the highest standards of integrity and ethics.

——————————————— *DO THE RIGHT THING* ———————————————

- Your responsibilities:
  - Review
  - Understand
  - Acknowledge
  - Act in Accordance

52

EXHIBIT 15 - PAGE 179

## Open Door Policy

In an ongoing effort to uphold our Mission and Values, employees are encouraged to raise any work related concerns through the Time Warner Cable's (TWC) Open Door Process. This Open Door Process gives employees and applicants the opportunity to bring concerns about work-related situations to the attention of management and/or Human Resources.

**Under the Open Door Process, employees are encouraged to present their concerns to their front-line supervisor, departmental management or their Human Resources Business Partner.** If you believe that your concerns were not appropriately addressed at that first level or if you are hesitant to raise your concerns with them, you can then raise the concern with Employee Relations.

TWCA000134

53

EXHIBIT 15 - PAGE 180

## Open Door Policy (cont.)

**The Open Door Process can be used to raise any concerns about treatment within the Company.**

Examples include but are not limited to:

- Alleged unfair treatment, such as coercion, or intimidation
- Any alleged discrimination because of race, color, sex, age, religion, disability, national origin, veteran status, sexual orientation, gender identity or any other basis protected by federal, state or local laws
- Alleged unlawful harassment by a co-worker, manager or vendor
- Alleged retaliation for raising concerns about any of the above

54

TWCA000135

EXHIBIT 15 - PAGE 181

## Social Media Policy

All communication in social media channels must adhere to TWC's policies.

- TWC employees are responsible for the content they publish online, including blogs, wikis, forums, Twitter, Facebook and any other form of user-generated media.

- Post with care. Items posted online can be circulated widely, including to others you did not intend, and can survive long after you delete them. They can be indexed by search engines and copied by other sites, so it can remain public and associated with you even if the original post is deleted.

- Don't publish confidential or other proprietary information—of TWC or of any other company or person. If you want to post or report on a conversation that was meant to be private or internal to TWC, first seek permission from those originally involved.

- Do not create profiles on social media platforms that claim to represent Time Warner Cable in an official capacity.

- You may be subject to discipline if you engage in conduct online that violates company policies.

55

TWCA000136

EXHIBIT 15 - PAGE 182

## Non-Solicitation Policy

Time Warner Cable prohibits the solicitation, distribution and posting of materials on or at company property by any employee or non-employee, except as permitted by the Company.

The sole exceptions to this policy are:

* Charitable and community activities supported by TWC
* Company-sponsored programs related to TWC products and services

**Reminder**:

Be sure to get approval from Human Resources prior to posting materials or sending electronic announcements



56

TWCA000137

EXHIBIT 15 - PAGE 183

## Timekeeping

Company policy requires that all non-exempt (hourly) employees are paid for all time worked on behalf of the Company, including any overtime worked. Submitting or approving a timecard that does not contain a complete and accurate record of all time worked is strictly prohibited.

**You are responsible for ensuring that your time submitted in Kronos, TWC's timekeeping system, is accurate. You must be clocked into Kronos prior to performing work and should not clock out of Kronos until you have completed your work for the day. In addition, you should not perform any work during meal or rest breaks.**

Off the clock work is strictly prohibited. That means you must not perform work outside of your ordinary work hours unless you are required to do so by the Company. There are two situations in which you might be required or permitted to work beyond ordinary work hours:

– To complete work in progress, for example, to finish a customer call or work order; or
– At the direction or consent of management, for example, volunteering for additional shifts, outages, or other situations where management has specifically requested that you work outside of your normal work hours.

Performing work without being required or permitted to do so by the Company as described above, can lead to discipline including possible termination.

57

TWCA000138

EXHIBIT 15 - PAGE 184

## Timekeeping (cont.)

In addition to core job functions, work time includes the following:

- Reviewing work related communications, including emails, voice mails, memos, etc.
- Training
- Cleaning, maintaining, fueling or inspecting your company assigned vehicle
- Picking up or returning equipment or materials in the warehouse
- Logging into or out of computer programs or software applications (e.g., billing, sales tracking, issue tracking or other computer programs)
- Other work-related responsibilities

Should you have any questions about the timekeeping policy, please contact your local Human Resources Business Partner.

58

TWCA000139

EXHIBIT 15 - PAGE 185

# Media/Press Policy

General Media/Press Policy Guidelines:

- TWC employees in the role of Vice President and above are authorized to speak to the media and represent Time Warner Cable.

- Members of the media/press are not permitted on Time Warner Cable property unless accompanied by a staff member from the Communications Department or a representative from Time Warner Cable in the position of Vice President or above.

- Employees should not contact members of the media to pitch stories or to act as sources for articles regarding Time Warner Cable without contacting Public Affairs.

- An employee may pitch a story or provide information unrelated to Time Warner Cable to the media during unscheduled work time and off of the premises of Time Warner Cable.

59

TWCA000140

EXHIBIT 15 - PAGE 186

# Disclosure of Criminal Charges and Convictions Policy

TWC employees are required to disclose any criminal charges filed and/or convictions against them while employed by the Company.

- If charged with a misdemeanor or felony, the employee  must report the charge to local HR by the next business day after the charge has been filed.
- Failure to report a charge, may result in corrective action up to and including termination.
- Depending on the severity of the charge, the employee may be subject to termination.
- Employees who are separated, and later found not guilty, may reapply.

60

EXHIBIT 15 - PAGE 187

## Employment of Relatives (Nepotism)

We understand that at times relatives or individuals with close personal relationships of current TWC staff may be candidates and successfully secure positions within the organization.

- At no time should an employee directly or indirectly supervise his/her relative or close personal friend.
- Employee disclosure of such personal relationships is necessary to allow the Company to evaluate the situation. If an employee does not disclose a relationship that presents potential for personal bias may be subject to corrective action up to and including termination of employment.

61

TWCA000142

EXHIBIT 15 - PAGE 188

# Corrective Action Policy

Employees are expected to maintain the highest level of quality in performance and professional conduct in order to foster a productive and safe work environment for all employees. The corrective action policy is structured to address policy violations and/or performance deficiencies.

Corrective action may be progressive which means:

- Where appropriate, corrective action applied to an employee will increase in severity each time an offense is committed or a performance deficiency continues after a defined period of time for improvement has passed;
- it may begin at any step of the corrective action process, depending on the severity of the violation, seriousness of the performance deficiency or other relevant factors, and may result in termination of employment;
- corrective action will be applied fairly and will be commensurate with the offense committed.

*Employees are eligible to apply for internal positions if they have no documented corrective action within the past six (6) months.*

62

TWC:A000143

EXHIBIT 15 - PAGE 189

# EXHIBIT 16

EXHIBIT 16 - PAGE 190

*CARMEN FULLER, et al vs.*
*TWC ADMINISTRATION, LLC, et al*

---

*BRENT QUICK*
*December 20, 2018*

---



ELLEN GRAUER
COURT REPORTING CO. LLC

126 East 56th Street, Fifth Floor  New York, New York 10022
P:  212-750-6434   F:  212-750-1097
www.ellengrauer.com

*Original File 255587.TXT*
*Min-U-Script® with Word Index*

EXHIBIT 16 - PAGE 191

```
 1   IN THE UNITED STATES DISTRICT COURT

 2   FOR THE SOUTHERN DISTRICT OF CALIFORNIA
     ----------------------------------------------X
 3   CARMEN FULLER, an individual, LAURENCE GIBBS,
     an individual, Et Al.,
 4
                          Plaintiffs,
 5
          -vs.-
 6
     TWC ADMINISTRATION, LLC, a Delaware Limited
 7   Liability Company and DOES 1 through 10,
     inclusive,
 8
                          Defendants.
 9
     Case No. 3:17-cv-01513-DMS-AGS
10   ----------------------------------------------X

11

12                     1230 Columbia Street
                       San Diego, California
13
                       December 20, 2018
14                     9:59 a.m.

15

16          VIDEOTAPED DEPOSITION OF BRENT QUICK,

17   taken before RENEE K. PAPIERNIAK, a Certified

18   Shorthand Reporter.

19

20

21

22

23        ELLEN GRAUER COURT REPORTING CO., LLC
             126 East 56th Street, Fifth Floor
24             New York, New York 10022
                       212-750-6434
25                     REF:   255587
```

EXHIBIT 16 - PAGE 192

```
 1    A P P E A R A N C E S:

 2

 3    THE MARKHAM LAW FIRM

 4    For Plaintiffs:

 5         750 B Street, Suite 1950

 6         San Diego, California  92101

 7    BY:  MICHAEL MORPHEW

 8         619.615.2067

 9         mmorphew@markham-law.com

10

11

12    KABAT CHAPMAN & OZMER, LLP

13    For Defendant TWC Administration, LLC:

14         171 17th Street NW, Suite 1550

15         Atlanta, Georgia  30363

16    BY:  SHAWNA M. MILLER

17         JOSEPH W. OZMER II

18         404.400.7300

19         jozmer@kcozlaw.com

20         smiller@kcozlaw.com

21

22

23    ALSO PRESENT:

24         MICHAEL DUARTE, Videographer

25
```

EXHIBIT 16 - PAGE 193

1    -- hang on just a second.  Let me backtrack.

2         When you complained to your supervisors about

3    receiving -- not getting paid meal penalties or

4    performing off the clock work prior to your shift, they

5    told you that they would adjust your time.  Correct?

6         MR. MORPHEW:  Objection.  Misstates prior

7    testimony.  Asked and answered.

8         THE WITNESS:  I can answer.  Correct?

9    BY MS. MILLER:

10        Q.  You can answer.

11        A.  My supervisor told me that they would adjust my

12   numbers.

13        Q.  Okay.  Sorry.  We didn't get a verbal answer

14   earlier, and that's my fault for not making sure.  That's

15   why we had to go back through it.

16        Did you ever complain to human resources?

17        A.  Our HR was nonexistent.  I had tried to talk to

18   human resources several times and it was pushed off to me

19   to call a certain phone number.  Our human resources was

20   there for nothing but disciplining people and rolling out

21   the health and wellness program.  They didn't do anything

22   like most human resource programs do.  It was a horrible

23   human resource program, in fact.

24        Q.  Okay.  So in the instances where you tried to

25   talk to human resources and you were told to call a

EXHIBIT 16 - PAGE 194

1   BY MS. MILLER:

2       Q.  Correct.  If you want a pen to mark these, I

3   can't hand you one.

4           THE REPORTER:  Do you want him to mark on the

5   exhibits?

6           MS. MILLER:  Oh, yeah.  You might not want to

7   mark on yours.  It's on the exhibit.

8           THE WITNESS:  The numbers are what they are, you

9   know, and --

10          MS. MILLER:  You can mark it if it's easier for

11  you.

12          MR. MORPHEW:  An alternative, we can keep his

13  clean and he can mark on --

14          MS. MILLER:  Oh, we can use those as the marked

15  exhibits.  That works too.

16          THE WITNESS:  How would I have badged in at 8:03

17  but clocked in at 8 o'clock?

18  BY MS. MILLER:

19      Q.  I don't know.  But on this day, it somehow

20  happened.  And so you were paid for time before you

21  badged in.  Correct?

22      A.  Which is another example of supervisors

23  adjusting the time.

24      Q.  And they adjusted your time if you asked them

25  to.  Correct?

EXHIBIT 16 - PAGE 195

1        A.   No.   They did it on their own.

2        Q.   How do you know they did it on their own?

3        A.   Because they would tell us.

4             MR. MORPHEW:   Objection.   Calls for

5    speculation.

6             THE WITNESS:   They would tell us.

7    BY MS. MILLER:

8        Q.   Okay.   So they bumped your -- even though you

9    didn't get in the door and log into Avaya at 8:04 they

10   would bump your time back down to 8 o'clock?

11       A.   In this example, it clearly shows that.

12       Q.   Okay.   All right.   So you were paid for time

13   that you weren't even at your desk on this particular

14   day.   Correct?

15            MR. MORPHEW:   Objection.   Calls for speculation.

16            THE WITNESS:   In this case, yes.

17   BY MS. MILLER:

18       Q.   Okay.   Let's go to the next day, to December

19   16th -- I'm sorry -- November 16th, 2015.   And we'll

20   start with the badge records, which show a -- that the

21   first badge swipe on November 16th, 2015 occurring at

22   8:11 a.m.   Correct?

23       A.   Uh-huh.   Yes, ma'am.

24       Q.   And then if we go over to the Avaya records on

25   that same date, November 16th, 2015, it shows you logging

EXHIBIT 16 - PAGE 196

1   into Avaya two minutes later, at 8:13 a.m.  Correct?

2        A.  We're looking -- referencing November 16th.

3        Q.  Yes.

4        A.  November 16th I badged in at 8:11.

5        Q.  Uh-huh.

6        A.  It has me clocking in at 8 a.m.?

7        Q.  Right.

8        A.  And what is this form again, this one right

9   here?

10       Q.  Exhibit 26, that's the Avaya records.

11       A.  Avaya.  This is all around the same time as my

12  disciplinary action for my bereavement.  All these dates

13  that you're referencing.

14       Q.  Wasn't your disciplinary action for your

15  bereavement your termination in 2017?

16       A.  Well, do you see on November 14th -- oh, no.

17  I'm sorry.  I just saw bereavement there.

18       Q.  But the Avaya records show -- so on November

19  16th, 2015, is it correct that the badge swipe records

20  show you swiping into the building at 8:11 a.m., then if

21  you go to Exhibit 26, the Avaya records show you logging

22  into Avaya at 8:13 a.m.  And then if you look at your

23  Kronos records, it shows a clock-in time of 8 a.m.,

24  meaning -- which was 11 minutes before you swiped into

25  the building and 13 minutes before you logged into Avaya.

EXHIBIT 16 - PAGE 197

1   Correct?

2        MR. MORPHEW:  Objection.  The documents speak

3   for themselves.

4        THE WITNESS:  You know, that's kind of a --

5   it -- that is the -- it does show that.  But that doesn't

6   mean I didn't piggyback off someone in the building,

7   clock in, and then go out to my car to get something and

8   then come back in.  It's hard to say.

9   BY MS. MILLER:

10      Q.  Right.

11      A.  Or it could have been that my supervisor

12  adjusted my time.

13      Q.  Okay.  But you were paid for all time from 8

14  a.m. after.  Correct?  Whether you were at your desk or

15  not.  Right?

16        MR. MORPHEW:  Objection.  Calls for

17  speculation.

18        THE WITNESS:  From 8 o'clock, correct.

19  BY MS. MILLER:

20      Q.  Okay.  And then let's look at the next date,

21  November 17th, 2015.  If you look at the badge swipe

22  records, it shows that you swiped into the building at

23  8:16 a.m. Exhibit 26, the Avaya records, show you logging

24  into Avaya at 8:17 a.m., just a minute later.  And the

25  Kronos records show you clocking in at 8 a.m., which was

EXHIBIT 16 - PAGE 198

64

1   16 minutes before your badge swipe and 17 minutes before

2   your Avaya login.  Is that correct?

3        A.  Okay.  Let me take a look.  If that's what it

4   says, I'm sure that's what it says.  And we're

5   referencing the 17th or the 18th?

6        Q.  The 17th.

7        A.  8 a.m. on Kronos, 17th.  8:16 on the badge

8   swipe.  And 8:17 on Avaya, yeah.

9        Q.  Okay.  So on November 17th, 2015, you were paid

10  from 8 a.m. forward despite the fact that you swiped into

11  the building at 8:16.  Correct?

12        MR. MORPHEW:  Objection.  Calls for

13  speculation.

14  BY MS. MILLER:

15        Q.  Is that correct?

16        A.  Yeah, I would assume.

17        Q.  Okay.  So looking at these, can you admit that

18  you were paid for times that you weren't even at your

19  desk?

20        MR. MORPHEW:  Objection.  Calls for

21  speculation.

22        THE WITNESS:  No.

23  BY MS. MILLER:

24        Q.  But you already admitted that you were paid for

25  time before you had swiped into the building.  Right?

EXHIBIT 16 - PAGE 199

1    Q.   Okay.  You mean, prior to logging into Avaya?

2    A.   Prior to taking phone calls on Avaya.

3    Q.   Okay.  Um, well, let's look to another time

4  period since you said that this could have been an

5  instance related to the suspension.

6         Let's go to March 5th, 2016, which is four

7  months later.  And in the badge records, the number at

8  the bottom should be Quick 000822.  If you flip to the

9  badge records, please, 000822.

10   A.   What's the date in question?

11   Q.   Um, let's look at March 7th, 2016.  So it's

12  actually 823.

13   A.   You said March 7th?

14   Q.   Yes.  On the Kronos records, that's Quick

15  000200.  And on the Avaya records, it's page 16.

16         Okay.  It looks like everyone is there.  So

17  we're looking at March 7th, 2016.  If you look at the

18  Avaya record -- I'm sorry -- the badge swipe records, it

19  shows you swiping into the building at 8:13 and 59

20  seconds.  So let's just round up and call it 8:14 a.m.

21  Is that correct?

22   A.   I'm sorry --

23   Q.   On the badge swipe records.

24   A.   What was the date again?

25   Q.   March 7th, 2016.

EXHIBIT 16 - PAGE 200

72

```
 1        A.  8:13 on the badge swipe.

 2        Q.  The Avaya records reflect you logging into Avaya

 3   at 8:15 a.m., one minute later.  Correct?  Is that

 4   right?

 5        A.  Yeah.

 6        Q.  Okay.  And the Kronos records show a punch-in

 7   time of 8 a.m.  Is that correct?

 8        A.  March 17th (sic) you said?

 9        Q.  March 7th.

10        A.  Correct.

11        Q.  Okay.  So on March 7th, 2016, the records

12   reflect that your punch-in time was 14 minutes before you

13   swiped into the building with your badge and 15 minutes

14   before you logged into Avaya.  Is that right?

15             MR. MORPHEW:  Objection.  The documents speak

16   for themselves.

17             THE WITNESS:  What was it, March 7th?

18   BY MS. MILLER:

19        Q.  Yes.

20        A.  Correct.

21        Q.  Okay.  And so this is another instance where you

22   were paid for time before you -- before your first badge

23   swipe.  Is that right?

24             MR. MORPHEW:  Objection.  Calls for speculation,

25   incomplete hypothetical.
```

EXHIBIT 16 - PAGE 201

1          THE WITNESS:  It was prior to me taking calls.
2   BY MS. MILLER:
3      Q.  But it was prior to your first badge swipe as
4   well.  Correct?
5          MR. MORPHEW:  Objection.  Asked and answered,
6   calls for speculation.
7          THE WITNESS:  It was prior to me taking calls.
8   BY MS. MILLER:
9      Q.  And it was also prior to your first badge swipe.
10   Is that right?
11      A.  Yes.
12      Q.  Okay.  Do you know whether you had a team
13   meeting on this day?
14      A.  No, I do not.
15      Q.  Okay.
16      A.  It could have been a training.  You know, it's
17   hard to say.
18      Q.  Okay.  But you don't know.  Right?
19      A.  No.  No, I don't recall what it was.
20      Q.  Okay.  And you said you and Brian Richardson
21   were friends.  Right?
22      A.  Yes.
23      Q.  And he was your supervisor?
24          MR. MORPHEW:  objection.  Misstates prior
25   testimony.

EXHIBIT 16 - PAGE 202

BY MS. MILLER:

    Q.   And he was your supervisor?

    A.   At one point in time, correct.

    Q.   Okay.  Do you know if he was your supervisor in March 2016?

    A.   I don't know.

    Q.   Okay.  Do you know if he was your supervisor in November 2015?

    A.   I don't know.

    Q.   Okay.  Let's just look at the next date, March 8th, 2016.

    A.   When I say we -- can I go back to your response in regards to Brian Richardson?

    Q.   Yeah.  If you need to clarify your answer, that's fine.

    A.   You referenced him as a friend.  We're not, like, friends.  We're Facebook friends, like -- that -- we're not really friends, like --

    Q.   Okay.  I thought you told me earlier that you had socialized with him outside of work?

    A.   Briefly, on the phone.

    Q.   Okay.  But you didn't consider him a good friend?

    A.   No.

    Q.   Okay.  Let's look at March 8th, 2016, which is

EXHIBIT 16 - PAGE 203

1    just the next day.  So go to your badge swipe records.

2         A.  I'm sorry, what was the date again?

3         Q.  March 8th.  It's just the next day.

4         A.  Okay.

5         Q.  And your badge swipe records show you swiping in

6    the building at 8:12 and 56 seconds in the morning.  Is

7    that accurate?

8         A.  Uh-huh.

9         Q.  Okay.  And then if you go to the Avaya records,

10   it shows an Avaya log-in at 8:13 a.m., is that right, on

11   March 8th, 2016?

12        A.  March 8th?

13        Q.  Yes.

14        A.  8:13.

15        Q.  Okay.  And then if you look at your Kronos

16   records, it shows a punch-in time of 8 a.m.  Is that

17   right?

18        A.  Yeah.

19        Q.  Okay.  So on this day, your Kronos punch-in time

20   is 13 minutes before your first badge swipe and -- just

21   about -- I guess it's 13 minutes and 4 seconds before

22   your first badge swipe, and 13 minutes before your Avaya

23   login.  Is that correct?

24        A.  Correct.

25        Q.  Okay.  So this is another example of what we

EXHIBIT 16 - PAGE 204

1  were talking about, where your Kronos records are earlier

2  than your first badge swipe into the building and your

3  first Avaya login.  Right?

4     A.  Correct.

5          MR. MORPHEW:  Objection.  Compound.

6  BY MS. MILLER:

7     Q.  So especially this date, these records show that

8  you could get in the door and logged into Avaya within a

9  minute.  Is that right?

10          MR. MORPHEW:  Objection.  Calls for

11  speculation.

12          THE WITNESS:  As I started before, if it was not

13  the first day of the week or had I not shut down my

14  computer all the way -- the only program I would close in

15  and close out would be the Avaya.

16  BY MS. MILLER:

17     Q.  Okay.

18     A.  If it was the beginning of the workweek or my

19  computer hadn't been shut down, then it would take

20  longer.  That's why a supervisor would adjust your time

21  because otherwise I would have been late every day.

22     Q.  So a supervisor would adjust your time if it

23  took longer?

24          MR. MORPHEW:  Objection.  Calls for

25  speculation.

EXHIBIT 16 - PAGE 205

1    had to meet as well.  I don't remember what those are off

2    the top of my head.  But you had to have a -- each of

3    these -- in other words, if you had a bad FCR or a bad

4    first call resolution, you'd have to take in more calls

5    in order to beef up that AHT or -- excuse me -- that FCR,

6    that first call resolution.  So if you got -- if you

7    were -- only had to maintain a certain FCR level, and I

8    knew my FCR wasn't good, that means I had to crank in a

9    bunch more calls in order for that FCR to -- do you

10   understand what I'm saying?

11        Q.  I see what you're saying, yes.  Yes.

12        A.  So it depends on where you were on -- what you

13   needed to do in order to meet that goal.

14        Q.  Okay.  Do you know if your metrics were

15   different as a customer -- let me rephrase that question.

16   Strike that.

17             Did you have different metrics when you were a

18   customer care agent than you did when you were technical

19   support?

20        A.  Yes.

21        Q.  Okay.  And let's go back to AHT, average

22   handling time.  Do you recall if the goal was under ten

23   minutes?

24        A.  I know it was under ten minutes.

25        Q.  Okay.  And you had a little bit of trouble

EXHIBIT 16 - PAGE 206

1   Avaya because of all the difficulties we were having with

2   it.  So it was not abnormal for it to go down.

3       Q.  Okay.  And if Avaya went down, were you able to

4   receive calls?

5       A.  Yes.

6       Q.  Okay.  And what system would you receive them

7   through if Avaya wasn't working?

8       A.  We used Avaya, but Avaya didn't function the way

9   it would -- properly.  In other words, you could get

10  misrouted calls.  You could get calls from different call

11  centers.  Calls from areas that didn't pertain to your

12  department.

13          And once you had to transfer -- sometimes the

14  transfer system would go down, and you couldn't transfer

15  at all.  So, in other words, when I say it went down -- I

16  didn't mean it shut down completely.  It wasn't working

17  right.

18      Q.  Doing what it was supposed to be doing?

19      A.  Right.

20          (Exhibit No. 28 marked.)

21  BY MS. MILLER:

22      Q.  Okay.  All right.  And I'm handing you what has

23  been marked as Exhibit 28.  This is a document -- a

24  one-page document entitled Time Keeping Policy

25  Acknowledgment.  Have you seen this document before?

EXHIBIT 16 - PAGE 207

```
1        A.  Yeah, of course.  I signed it.

2        Q.  Okay.  So let's go through it for just a second.

3   You can see -- I'll point you to the last sentence, it's

4   the very first paragraph, it says, "All hours worked,

5   benefit and leave time, must be accurately reflected on

6   the timecard."  Going down to the next paragraph, it

7   says, "The electronic timecard must be approved at the

8   end of each pay period by both the employee and the

9   supervisor.  The electronic signature in Kronos acts the

10  same as a written signature, and indicates that both the

11  employee and the supervisor know what time is entered on

12  the timecard and acknowledge that the time entered is

13  correct.  An incorrect timecard should never be

14  approved."  Did I read that correctly?

15       A.  Uh-huh.  Yeah.

16       Q.  Okay.  So this sets forth Time Warner Cable's

17  policy regarding timecard -- the timecard approval

18  process.  And is this what you understood the policy to

19  be?

20       A.  It's what the policy is.  It doesn't mean they

21  adhered by it.  But yeah, it's the policy.

22       Q.  Okay.  And you never approved an incorrect

23  timecard, did you?

24       A.  We never got a timecard to approve.  There was

25  nothing sent to us to sign.
```

EXHIBIT 16 - PAGE 208

1    Q.   Right.   But you would have to approve them in

2    Kronos, correct, that's what this says?

3    A.   The way it worked was we clocked in and clocked

4    out through Avaya Monday through Friday, or whatever our

5    schedule was.   And then it was sent over to our

6    supervisor.   It wasn't like something -- we had to sign a

7    document or verify anything.   So what happened to it from

8    thereafter -- we have no clue what happened to it.

9    Q.   Okay.   Did you ever go into Kronos to look at

10   your electronic timecard?

11   A.   Only to check -- some people did.   I never

12   really did because I didn't really care.   Why would I

13   need to?   I need to know what time I was there, what time

14   I clocked out?   No.

15   Q.   Okay.

16   A.   It was what it was.   The only time I ever looked

17   at Kronos was to check my vacation time or sick time or

18   see if I worked any overtime.   So no, I never really

19   checked my Kronos.

20   Q.   Okay.

21   A.   So --

22   Q.   And then going down to the next period, you see

23   TW -- I'm sorry, next period -- next paragraph.   It says,

24   "Additionally, Time Warner Cable has a strict time

25   keeping policy regarding non-exempt hourly employees."

EXHIBIT 16 - PAGE 209

1  Do you see that?

2       A.  Uh-huh.

3       Q.  And you acknowledge that requirement -- that

4  that was a requirement during your employment at Time

5  Warner Cable?

6       A.  Yep.

7       Q.  Okay.  And then it goes on to say, "All

8  employees are to take paid rest breaks, 15 minutes for

9  each four hours of work.  Employees may also" -- "must

10  also take an unpaid lunch break of 60 minutes during each

11  shift of six hours or more."  Did you understand that to

12  be company policy?

13       A.  Yeah.

14       Q.  Okay.  And then at the very end of that

15  paragraph it says, "Working off the clock is strictly

16  prohibited."  Did I read that correctly?

17       A.  Correct.

18       Q.  Okay.  And you understood that to be Time Warner

19  Cable's policy.  Correct?

20       A.  Correct.

21       Q.  Okay.  And did you comply with these

22  requirements?

23       A.  I did.

24       Q.  Okay.  And then the next paragraph says,

25  "Misrepresentation of hours worked, forgery or other

EXHIBIT 16 - PAGE 210

1    tampering with these records is a violation of the law

2    and any employee found to have engaged in this behavior

3    will be subject to corrective action, up to and including

4    termination of employment."  Did I read that correctly?

5         A.  Yeah.

6         Q.  Okay.  And you understood that to be Time Warner

7    Cable's policy?

8         A.  Yes.

9         Q.  Okay.  And then you see at the bottom it says,

10   "By signing the below, I acknowledge that I understand

11   Time Warner Cable's time keeping policy.  I understand

12   that:  No. 1, I'm responsible for monitoring my timecard

13   and keeping it up-to-date during each period"?

14        A.  Uh-huh.  Yes.

15        Q.  And that's something you -- you would monitor it

16   as you went, but you didn't approve -- you didn't review

17   your timecards at the end of each pay period, did you?

18        A.  I'm sorry, could you repeat the question?

19        Q.  You would monitor your timecard as you went but

20   not at the end of each pay period?

21             MR. MORPHEW:  Objection.  Misstates prior

22   testimony.

23             THE WITNESS:  There was really no timecard to

24   update or to monitor.  We didn't receive a copy of the

25   timecard.

EXHIBIT 16 - PAGE 211

1   BY MS. MILLER:

2        Q.   Okay.  Did you -- do you know if you had access

3   to look at your timecard in Kronos?

4        A.   We could look at Kronos and see when we clocked

5   in and clocked out.  But there was no way of adjusting

6   anything.  We could put in a request to adjust it, but

7   that was simply it.  It was merely a request.

8        Q.   Okay.  No. 2, it says, "I acknowledge that I

9   must take scheduled breaks."  Did you comply with that

10  policy?

11       A.   Yes.

12       Q.   No. 3, it says, "I acknowledge that I must

13  approve my timecard at the end of every pay period."

14  We've already discussed that.

15            And then No. 4, "I further acknowledge that I

16  must request timecard corrections in writing from my

17  supervisor."

18            Okay.  All right.  And when you first started at

19  Time Warner Cable, do you recall sitting through an

20  orientation?

21       A.   Yes.

22       Q.   Okay.  Did they show you a slide show during

23  that orientation?

24       A.   Many.

25       Q.   Many slide shows.  Okay.  I'm going to hand you

EXHIBIT 16 - PAGE 212

 1   know whether it was a slide or a packet, but --

 2        Q.  Okay.

 3        A.  It wouldn't be abnormal to see something like

 4   this.

 5        Q.  Okay.  Do these look familiar to you, or you

 6   just can't recall because it was so long ago?

 7        A.  No.  It says "TWC Employee Orientation," so I

 8   imagine this -- I would be -- assume this would be part

 9   of the packet that we would have received in our new hire

10   packet --

11        Q.  Okay.

12        A.  -- that we all received.  I don't believe it was

13   a slide show.  I believe it was a book about that thick

14   that we received -- that every employee received in your

15   handbook.

16        Q.  Okay.  All right.  So let's look then to the

17   slide that says "Time Keeping."

18        A.  Okay.  Okay.

19        Q.  All right.  And let's look at the first

20   paragraph.  It says, "Company policy requires that all

21   nonexempt hourly employees are paid for all time worked

22   on behalf of the company, including any overtime work.

23   Submitting or approving a timecard that does not contain

24   a complete and accurate record of all time worked is

25   strictly prohibited."  Did I read that correctly?

EXHIBIT 16 - PAGE 213

```
 1        A.  Correct.

 2        Q.  Okay.  And that's what you understood company

 3   policy to be?

 4        A.  Correct.

 5        Q.  Okay.  And then you can see the next sentence is

 6   bolded and it says, "You are responsible for ensuring

 7   that your time submitted in Kronos, TWC's timekeeping

 8   system, is accurate."  Is that correct?

 9        A.  Correct.

10        Q.  Okay.  And you made efforts to make sure that

11   what you submitted in Kronos or Avaya was -- accurately

12   reflected your time worked.  Correct?

13        A.  Um, so, like I said before, Avaya would clock us

14   in whenever we clocked in on Avaya, whenever we started

15   taking calls.

16        Q.  Uh-huh.

17        A.  When we stopped taking calls to go on break or

18   when we started taking calls coming back from break.  But

19   it didn't account for the time that we were doing things

20   off call or after call or any other stat.

21        Q.  Okay.  But you could use that after call code

22   you just talked about.  Right?

23        A.  Like I said, it was highly discouraged to use,

24   so it wouldn't be abnormal to be working off the clock.

25        Q.  Okay.  Let's look at the next sentence then.  In
```

EXHIBIT 16 - PAGE 214

1    bold it says, "You must be clocked in to Kronos prior to

2    performing work."  Do you see that?

3         A.  Uh-huh.

4         Q.  Okay.  And you're actually on the wrong slide.

5         A.  I know what -- I know what the policies are.

6         Q.  Okay.  So you see that it says, "You must be

7    clocked into Kronos prior to performing work," and that's

8    bolded.  Right?

9         A.  Uh-huh.

10        Q.  Yours look like it's in the wrong order

11   actually.  Hang on.  Let me flip you to the right page.

12   You have a mixed-up copy.

13            MS. MILLER:  You know what, can we take a quick

14   break.

15            THE VIDEOGRAPHER:  Going off the record.  The

16   time is 1:15 p.m.

17            (Recess taken.)

18            THE VIDEOGRAPHER:  We are back on the record.

19   The time is 1:27 p.m.

20   BY MS. MILLER:

21        Q.  All right.  Mr. Quick, now that we got the

22   exhibit fixed, if you look at the timekeeping slide in

23   the first paragraph, the bolder letters, it says, "You

24   must be clocked into Kronos prior to performing work."

25   Did I read that correctly?

EXHIBIT 16 - PAGE 215

123

1          A.   Yes.

2          Q.   And that's what you understood Time Warner

3     Cable's policy to be.   Correct?

4          A.   It's what the packet says.

5          Q.   Okay.   The policy says?

6          A.   Yes.

7          Q.   Okay.   And it goes on to say, "And you should

8     not clock out of Kronos until you've completed your work

9     for the day."   Is that correct?

10         A.   Again, we didn't clock in and out of Kronos.

11         Q.   Okay.   But Avaya was connected to Kronos, so if

12    you log out of Avaya, it would clock you out of Kronos.

13    Right?

14         A.   Correct.

15         Q.   Okay.

16         A.   And there is circumstances for which we had

17    to -- which is also notated on here, to finish up calls,

18    to notate calls, or for callbacks as well.   In that case,

19    we would have to go into an AUX code.

20         Q.   Okay.   But you would still be on the clock at

21    that point.   Correct?

22         A.   Unless it was after call or a meal break or

23    another code, so --

24         Q.   After call didn't clock you out, did it?

25         A.   I don't believe so.

EXHIBIT 16 - PAGE 216

1       Q.  Okay.  And then it goes on to say, "In addition,

2   you should not perform any work during meal or rest

3   breaks."  Did you understand that to be Time Warner

4   Cable's policy?

5       A.  Yes.

6       Q.  Okay.  And then the first sentence of the next

7   paragraph says, "Off the clock work is strictly

8   prohibited."  And you understood that to be Time Warner

9   Cable's policy?

10      A.  Yes.

11      Q.  Okay.  Now, let's flip to the next page, the

12  slide that says "Time Keeping (continued.)"  And at the

13  top it says, "In addition to core job functions, work

14  time includes the following," and then it has a list of

15  certain bullets underneath that.  Do you see what I'm

16  talking about?

17      A.  Uh-huh.

18      Q.  Okay.  You see the one, two, three, four -- the

19  fifth bullet says, "Logging into or out of computer

20  programs or software application, example, billing, sales

21  tracking, issue tracking, other computer programs."

22      A.  Uh-huh.

23      Q.  Okay.  So you understood that to be work time

24  where you should be clocked in.  Correct?

25      A.  Well, how would you -- how would that work?

EXHIBIT 16 - PAGE 217

```
 1   point.  Who would want to work and not get paid for that
 2   time anyways?  Exclamation point.  If you would like to
 3   load your tools before your scheduled shift, you are
 4   allowed to manually clock in using Kronos up to five
 5   minutes before your scheduled start of shift.  Keep in
 6   mind, that once you're scheduled to start, then you
 7   should log into Avaya and immediately begin taking
 8   calls."
 9        A.  Uh-huh.
10        Q.  Did I read that correctly?
11        A.  Yes, you did.
12        Q.  So this says that you were able to clock in five
13   minutes early and load programs at that point, if you
14   wanted to do that.  Correct?
15        A.  According to this, yes.
16        Q.  Okay.  And then it goes on and says, "Not to
17   worry if you don't show up early.  We don't require it.
18   Just make sure that you log in to Avaya at your scheduled
19   start of shift, launch AAD, and immediately begin taking
20   calls.  You can load additional tools as you go."  Did I
21   read that correctly?
22        A.  Correct.
23        Q.  Okay.  So this gives -- this was Christina Ridge
24   giving a number of representatives -- I guess,
25   communicating the policy that, one, they were allowed to
```

EXHIBIT 16 - PAGE 218

```
 1   load your programs before clocking in, did you?
 2              MR. MORPHEW:  Objection.  Asked and answered.
 3              THE WITNESS:  Not a policy.  But there was --
 4   not a policy we signed.  But there would have been
 5   something like this.  It would have been handed out
 6   during a meeting or a slide show or a conversation
 7   between a supervisor to have all your tools open.
 8   BY MS. MILLER:
 9        Q.  But did you ever see any policy saying that you
10   should load your programs before clocking in?
11              MR. MORPHEW:  Objection.  Asked and answered.
12              THE WITNESS:  No.
13   BY MS. MILLER:
14        Q.  Okay.  Did any supervisor ever tell you that it
15   was required to load your programs before you clocked
16   in?
17        A.  Can you repeat the question, please?
18        Q.  Did any supervisor ever tell you that it was
19   required to load programs before clocking in?
20        A.  Yes.
21        Q.  Who told you that?
22        A.  Supervisors.
23        Q.  Which supervisors?
24        A.  I would say Maria Jones and Brian Richardson.
25        Q.  Um, when they told you that you were required to
```

EXHIBIT 16 - PAGE 219

```
 1    testimony.
 2            THE WITNESS:  I never received anything stating
 3    this.
 4    BY MS. MILLER:
 5        Q.  My question is, when you said that supervisors
 6    told you that you were required to load programs off the
 7    clock, that was completely inconsistent -- that
 8    instruction was completely inconsistent with what
 9    Christina Ridge instructed her employees in the e-mail
10    marked as Exhibit 11.  Correct?
11        A.  Can you repeat the question, please?
12        Q.  When your supervisors told you that you were
13    required to load programs off the clock, that instruction
14    was completely inconsistent with what Christina Ridge
15    instructed her employees to do in the e-mail marked as
16    Exhibit 11?
17        A.  Correct.
18        Q.  Okay.  And you agree that any instructions from
19    a supervisor telling you that you had to load programs
20    before clocking in violated the strict timekeeping
21    policies we already went through?
22        A.  Correct.
23        Q.  And did you ever raise any issues up the chain?
24            You said you spoke with your supervisors.  But
25    did you ever speak with managers?
```

EXHIBIT 16 - PAGE 220

1      Q.   Okay.   Have you ever seen a policy that said
2  Time Warner Cable won't pay for login time?
3      A.   No.
4      Q.   Okay.   And when we talked earlier about where
5  your address is, you've lived -- oh, I'm sorry.   Let's go
6  back a second.   Let's backtrack.
7           So we went through the -- the timekeeping
8  policies, you know, that said "Don't work off the clock,"
9  correct, and that loading programs was compensable work
10  time.   Correct?
11          MR. MORPHEW:   Objection.   Misstates prior
12  testimony.
13          THE WITNESS:   Correct.
14  BY MS. MILLER:
15     Q.   Okay.   Did any supervisor ever tell you not to
16  record your time you worked in violation of this Time
17  Warner Cable policy?
18     A.   Can you repeat the question, please?
19     Q.   Did any supervisor ever tell you not to record
20  time worked?
21          MR. MORPHEW:   Objection.   Asked and answered.
22          THE WITNESS:   No.
23  BY MS. MILLER:
24     Q.   Okay.   Did any supervisor ever tell you you were
25  permitted to work off the clock in violation of the

EXHIBIT 16 - PAGE 221

```
 1    for my 15-minute breaks.  I don't think we were.  Because
 2    I think it was an option of an hour lunch or two 15s and
 3    a half.  So I don't think we were paid for our 15-minute
 4    breaks.
 5         Q.  If I told you that just -- this isn't disputed
 6    in this case, that you were paid for the 15-minute
 7    breaks --
 8         A.  Okay.  Then -- I would believe you then.
 9         Q.  Okay.  But given these timekeeping policies, you
10    knew that you would be subject to discipline if you ever
11    told a supervisor you were working off the clock.
12    Right?
13         A.  Oh, yeah.
14         Q.  Okay.  Because you knew that to be against
15    company policy?
16         A.  Yeah.
17         Q.  Okay.  Earlier we talked about your addresses
18    and where you reside.  You said that you currently reside
19    in Santee and before you resided in El Cajon.  And you
20    resided in both during your employment with Time Warner
21    Cable?
22         A.  Ahh, I believe so.
23         Q.  Okay.  And how far is Santee from the -- your
24    home in Santee from the San Diego call center?
25         A.  Length or time?
```

EXHIBIT 16 - PAGE 222

1        A.   Can you repeat the question, please?

2        Q.   Do you have any complaints regarding work you

3   performed at the end of your shift?

4        A.   My complaint is in regards to -- at the end of

5   the work shift there was -- ultimately, you would clock

6   out on Avaya, and there was times that I had to shut down

7   programs or send e-mails out and time off the clock,

8   unpaid, as well as at the beginning.  So it's more time

9   away from my family, more money -- less money in my

10  pocket.

11       Q.   Okay.  Um, are you complaining about anything

12  with respect to rest breaks in this case?

13       A.   During rest breaks we'd have phone calls.  I

14  mean, if you look at my paychecks you'll see that I think

15  I had one meal penalty in which I was paid for in my time

16  that I worked there.  And we'd have meetings or even

17  circumstances where there was phone calls where it went

18  over the sixth hour and you didn't have your lunch break.

19  We were never paid meal penalties for those.  Your

20  supervisor would adjust your time.

21       Q.   Okay.  So based on what you just said, is

22  that -- you said that sometimes your -- phone calls would

23  delay your rest breaks.  Correct?

24       A.   Correct.

25       Q.   And that sometimes phone calls would delay your

EXHIBIT 16 - PAGE 223

1   meal breaks and you did not receive meal penalties.

2   Correct?

3       A.   Correct.

4       Q.   Okay.  Anything else?

5       A.   I mean, on a -- it was very minimal but it

6   affected our breaks too.  I mean, it's not as substantial

7   as the time before or after.  But during our breaks, I

8   mean, it --

9       Q.   What do you mean "it affected our breaks"?

10      A.   It wasn't like a common occurrence but -- I'm

11  not -- you know, it's not even worth mentioning.

12      Q.   Well, if it's part of your claim I'd like to

13  know because this is our time to discuss it.

14      A.   I mean -- like I said before, sometimes you'd go

15  into break and you'd be notating an account or making an

16  outbound call.

17      Q.   Okay.  But you were on the clock during your

18  breaks -- your rest breaks.  Correct?

19          MR. MORPHEW:  Objection.  Misstates prior

20  testimony.

21          THE WITNESS:  Not always.

22  BY MS. MILLER:

23      Q.   You were off the clock during --

24      A.   Sometimes.

25      Q.   Would you manually clock out in Kronos for your

EXHIBIT 16 - PAGE 224

1        A.   No.

2        Q.   Okay.

3        A.   I didn't know it was an option.

4        Q.   Well, you testified earlier that you were aware

5    that supervisors could adjust punches?

6        A.   Yes.

7             MR. MORPHEW:   Objection.   Misstates prior

8    testimony.

9             THE WITNESS:   Yes.

10   BY MS. MILLER:

11       Q.   Okay.

12       A.   But I wasn't aware that there was any type of,

13   "Hey, I need you to do" -- that we could put in a request

14   for it.

15   BY MS. MILLER:

16       Q.   Um, you never saw any policy requiring you to do

17   any work after clocking out at the end of the day, did

18   you?

19             MR. MORPHEW:   Objection.   Asked and answered.

20             THE WITNESS:   No.

21   BY MS. MILLER:

22       Q.   Okay.   And you never complained to your

23   supervisor or manager about any off the clock work at the

24   end of the day?

25       A.   I believe I did.

EXHIBIT 16 - PAGE 225

```
 1              THE WITNESS:  I don't believe so.
 2   BY MS. MILLER:
 3       Q.  Okay.  Um -- and what's your understanding of
 4   what constitutes a violation of the rest break
 5   requirements in California law?
 6       A.  You have to be free from work, uninterrupted.
 7       Q.  Okay.  And you're not --
 8              THE REPORTER:  "And you're not"?
 9   BY MS. MILLER:
10       Q.  You're not alleging that you skipped any rest
11   breaks, just that you may have taken them a bit late or
12   done a couple of minutes work during the rest breaks.
13   Correct?
14              MR. MORPHEW:  Objection.  Misstates prior
15   testimony.
16              THE WITNESS:  I don't believe I ever skipped an
17   entire break.
18   BY MS. MILLER:
19       Q.  Okay.  And you were supposed to take your rest
20   breaks off the floor.  Right?
21       A.  Correct.
22       Q.  Okay.  Did you take your breaks off the floor?
23       A.  Most of the time I did.  Sometimes -- like I
24   said, I did have to wrap up something.
25       Q.  And that would be just a minute or two?
```

EXHIBIT 16 - PAGE 226

1    A.  Approximately.

2    Q.  Okay.  And typically if your rest breaks were a

3    couple of minutes later than scheduled, that was because

4    you were stuck on a call?

5    A.  Or a team meeting.

6    Q.  And in that case, it would have been impractical

7    for you to take your break at the time scheduled?

8    A.  Correct.

9    Q.  All right.  And we already talked about your

10   meal period complaints.  And let me know if I'm not

11   capturing everything here.  But you are alleging that

12   your meal periods would sometimes be late?

13   A.  Correct.

14   Q.  And you wouldn't receive meal penalties?

15   A.  Correct.

16   Q.  Okay.  You're not claiming you ever missed your

17   lunches?

18   A.  Never missed an entire lunch.

19   Q.  Okay.  Okay.  And we went through, um -- we went

20   through Exhibit 28 earlier, which was the Time Keeping

21   Policy Acknowledgement, which says a little bit about the

22   rest breaks and the meal breaks.  And is it your

23   understanding of company policy that you got two 15 -- if

24   you were working more than, I guess -- let's see what it

25   says.  You got two 15-minute rest breaks.  Correct?

EXHIBIT 16 - PAGE 227

172

```
 1        A.   Uh-huh.

 2        Q.   And if you you were working for more than six

 3   hours of work, you got a lunch break of 60 minutes.

 4   Correct?

 5        A.   It was a half hour.

 6        Q.   You got a half hour, not an hour lunch?

 7        A.   I believe you had an option because I remember

 8   at one point in time I got a half hour and two 15s and

 9   then I think it transitioned to an hour later.

10        Q.   Okay.  So your testimony is that at the

11   beginning of your employment you think you got a

12   30-minute lunch but later on you got an hour?

13        A.   Yes, ma'am.

14        Q.   Okay.  And you were told that you were required

15   to take your meal and rest breaks.  Correct?

16        A.   Yes, ma'am.

17        Q.   Okay.  They would remind you in meetings and

18   e-mails and otherwise?

19        A.   Yes, ma'am.

20        Q.   Okay.  And you understood that company policy

21   was that you could not work through, waive your right to

22   a meal break?

23        A.   I believe so.  I believe there was some

24   employees that did sign a meal waiver.

25        Q.   Do you know if that was with respect to a second
```

EXHIBIT 16 - PAGE 228

173

```
 1    meal break if you had a longer shift?
 2            MR. MORPHEW:  Objection.  Calls for --
 3    BY MS. MILLER:
 4        Q.  Does that sound a little bit more familiar to
 5    you?
 6            MR. MORPHEW:  Calls for speculation.
 7    BY MS. MILLER:
 8        Q.  Let me rephrase the question.  Let's not worry
 9    about the waiver.
10            You were aware that company policy was that you
11    could not work through or during your meal breaks.
12    Correct?
13        A.  Correct.
14        Q.  Okay.  And no one ever told you that you could
15    delay your lunch break beyond five hours beyond the start
16    of your shift?
17        A.  No, they didn't tell us that.  But in the
18    circumstances that we discussed before, sometimes it did
19    happen.
20        Q.  Usually because you were stuck on a call?
21        A.  Or a team meeting.
22        Q.  And do you know if you got the meal penalty
23    payment for those times?
24        A.  I -- I -- off the top of my head, I can remember
25    back -- I think I only got one -- paid for one or two
```

EXHIBIT 16 - PAGE 229

174

1   meal penalties.

2       Q.  But you remember receiving meal penalties?

3       A.  Receiving them but not getting paid for them.

4       Q.  Do you -- what is the difference?  Can you

5   clarify what you mean?

6       A.  In the State of California if you don't get a

7   meal -- if you don't get your lunch break within a

8   six-hour period they have to pay you another hour's worth

9   of pay.

10      Q.  Right.  So when I say "meal penalty," I'm

11  talking about the meal penalty payment.  You don't --

12  you're saying you don't remember receiving the meal

13  penalty payment but you remember taking a late lunch.  Is

14  that what you're saying?

15      A.  Yes, ma'am.

16      Q.  Okay.  Do you ever recall getting paid a meal

17  penalty payment?

18      A.  Once or twice I got paid.

19      Q.  So you did get paid at least at some point for a

20  meal penalty payment?

21      A.  Correct.  But I know it happened more than once

22  or twice.

23      Q.  And you're supposed to take your meal break off

24  the floor too.  Correct?

25      A.  Yes, ma'am.

EXHIBIT 16 - PAGE 230

1      Q.   Okay.  And you complied with that rule?

2      A.   As often as possible.

3      Q.   Did you ever request a meal penalty payment that

4   was not paid to you?

5      A.   No, ma'am.

6      Q.   Okay.  So we talked about a couple of the shifts

7   that you worked.  What I have here is 8 a.m. to 5, 9 to

8   6, and 5 to 2 a.m.  Does that sound right?

9      A.   Yes, ma'am.

10     Q.   Okay.  So when you showed up for whatever shift

11  you were working you'd receive a schedule that told you

12  when you were supposed to take your rest breaks and your

13  meal breaks.  Correct?

14     A.   No.

15     Q.   How would you -- but you received a schedule at

16  some point showing when you were supposed to take your

17  rest and meal breaks.  Right?

18     A.   Rest breaks, no.  Meal breaks just had to be

19  before the sixth hour.  But we did not receive a schedule

20  on when we should take our breaks.

21     Q.   Were you given freedom as to choose when to take

22  your rest breaks?

23     A.   Yes.

24     Q.   Were you told that you needed to take one rest

25  break before -- about two hours before -- or after

EXHIBIT 16 - PAGE 231

1  arriving for your shift and about two hours after

2  returning from lunch?

3       A.  It's a stressful environment, so sometimes if

4  you took a really bad call and it was an hour into your

5  shift or you just weren't feeling it that day, it was

6  five minutes into your shift, you could do it.  But it

7  was encouraged every two hours to take a break.

8       Q.  Okay.  And your meal breaks were typically

9  scheduled within three and a half to four and a half

10  hours into your shift.  Correct?

11      A.  No.  I'd say after the fifth hour but no later

12  than the sixth hour unless you went over with a phone

13  call or a team meeting.

14      Q.  If your records reflect that -- let me give you

15  an example.  For your 8 o'clock shift -- when you were

16  working the 8 o'clock shift, your Kronos records reflect

17  that you would typically take lunch around 11:30 to 12:30

18  each day.  That would be because you were scheduled that

19  day -- or for those times on that day.  Correct?

20          MR. MORPHEW:  Objection.  Incomplete

21  hypothetical.

22          THE WITNESS:  No.  I took -- when I worked the

23  evening shift I took my breaks strategically at a certain

24  time because our system would go down for 13 -- excuse me

25  -- 15 to 30 minutes every night.  And I knew that people

EXHIBIT 16 - PAGE 232

1    would call back.  So I specifically took my break around

2    that time so my numbers wouldn't be affected.

3    BY MS. MILLER:

4         Q.  What time was that?

5         A.  I'd say approximately 11:30 to 12 o'clock at

6    night.  Closer to 12, because the system would go down

7    every night at 12 o'clock.

8         Q.  Would you clock out for that time?

9         A.  I'd take my lunch break.

10        Q.  If your records reflected that when you were

11   working the 5 p.m. shift you usually actually took your

12   meal break around 9 p.m., would you have any reason to

13   dispute that?

14        A.  Whatever the records show is probably what it

15   is.  But if I could -- I know that I -- when I -- if you

16   see a pattern of me clocking down, it's not because I was

17   told to take a break at that time.  When I worked the

18   night shift, I clocked out at a certain time every night

19   because the system went down.

20        Q.  Okay.  So you would choose to wait until the

21   system was going down and delay your lunch break until

22   then so that your numbers wouldn't be affected?

23        A.  Correct.

24             MR. MORPHEW:  Objection.  Misstates testimony.

25   BY MS. MILLER:

EXHIBIT 16 - PAGE 233

1      Q.  Okay.

2      A.  But there was no schedule.

3      Q.  Got it.

4      A.  And it wasn't on a consistent, regular basis.

5  The goal was to take your lunch by the sixth hour.  They

6  make it seem like you would be disciplined if you -- that

7  you'd be penalized if you didn't take your lunch by the

8  sixth hour.

9      Q.  Okay.  And you were never told to take a lunch

10  after the sixth hour, were you?

11      A.  If the meeting went over, yes, we were told to

12  take -- "As soon as this meeting is over, take a lunch."

13  So yes.  Or, if you're on a phone call, "Wrap up the call

14  and then go on your lunch."

15      Q.  But the policy didn't allow you to take a break

16  after your sixth hour.  Right?  I'm sorry.  Let me strike

17  that.  Let me rephrase that.

18          The policy required you to take a lunch before

19  the sixth hour.  Correct?

20      A.  Correct.

21      Q.  Okay.  Are you aware of any occasion where your

22  supervisor knew you had no opportunity at all to take a

23  lunch before the sixth hour but didn't pay you a

24  penalty?

25      A.  Am I aware of a specific situation in which that

EXHIBIT 16 - PAGE 234

1    happened?

2         Q.   Uh-huh.

3         A.   Not a specific situation.

4         Q.   Okay.  Did you ever take a meal break that was

5    less than 30 minutes?

6         A.   I would say yes, because there was a

7    circumstances where I was wrapping up a call and notating

8    and it broke into my break period.

9         Q.   If you had an hour lunch that day, though, it

10   wouldn't have affected your -- you still would have had

11   more than 30 minutes for a lunch.  Right?

12        A.   Correct.

13            MR. MORPHEW:   Objection.   Incomplete

14   hypothetical.

15            THE WITNESS:   Correct.

16   BY MS. MILLER:

17        Q.   Okay.  And would you ever have been -- asked to

18   be paid for the time if -- you spent notating after a

19   call before your lunch break?

20        A.   Had I known now -- had I knew then what I knew

21   now, yeah, I would have.

22        Q.   Okay.  But you don't recall any instance where

23   you did ask?

24        A.   No.

25        Q.   Okay.  And are you familiar with an adherence

EXHIBIT 16 - PAGE 235

1    A.  If it was, then I don't recognize "adherence" as

2    being what we called it.  But if you tell me more about

3    it, I might recognize it a little bit more.

4    Q.  Okay.  So you don't recall -- you were never --

5    if you don't really remember what adherence is, you can't

6    remember if you were ever coached on it or anything like

7    that?

8    A.  Can you elaborate on it a little bit more?

9    Q.  Well, if you don't recall, you don't recall.

10   A.  I mean, we were coached on lots of things.  So,

11   I mean -- if you can elaborate on the question maybe I

12   might recognize it a little bit more.

13   Q.  We'll just move on.  As your meal period

14   approached, did any supervisor ever tell you you couldn't

15   be relieved of your duties and needed to continue to

16   work?

17       MR. MORPHEW:  Objection.  Incomplete

18   hypothetical.

19       THE WITNESS:  Was I ever told that I couldn't

20   go -- no.  We were told to wrap up the call and then go

21   on break.

22   BY MS. MILLER:

23   Q.  Okay.

24   A.  I mean, when you're in a position where you're

25   on the phone with somebody, it's not like "I'm going to

EXHIBIT 16 - PAGE 236

1    go on lunch."  It's not like you're in a restaurant.

2    "Hi, I'm Suzie, your server.  Phil is going to be taking

3    over while I go on break."  No.  I mean, you have to

4    finish the call and then go on break.

5        Q.  Okay.

6        A.  In other words, I couldn't transfer it and then

7    go on break.

8        Q.  Right.  And if you were stuck on a call and you

9    were coming up on your break, did your computer -- did

10   the system give you any audio -- audio or visual, I

11   guess, prompt to tell you "Time to go on your break"?

12       A.  No.

13       Q.  Okay.  So we spoke earlier about how your

14   average handling call times were around, say, 10 minutes.

15   So sometimes if you were on a call -- and sometimes you

16   were on a call and your meal break was approaching or

17   your rest break was approaching, and so you'd go into AUX

18   code and it would stop further calls, assuming that Avaya

19   was working correctly?

20       A.  Correct.

21       Q.  And this is why it would be impractical to take

22   your lunch break as scheduled because you'd have to

23   finish that call before you could go on your break?

24       A.  Correct.

25       Q.  Okay.  And you'd take your break as soon as that

EXHIBIT 16 - PAGE 237

1   call was over?

2       A.  After wrapping up the call, yes.

3       Q.  Okay.  So let's talk about rest breaks only.

4   Um, your supervisor always told you you must take your

5   rest breaks.  Right?

6       A.  Correct.

7       Q.  Okay.  And if you didn't take your breaks on

8   time your supervisor would try to remind you?

9           MR. MORPHEW:  Objection.  Incomplete

10  hypothetical.

11          THE WITNESS:  You're not talking about meal

12  breaks, you're talking about --

13  BY MS. MILLER:

14      Q.  I'm talking about rest breaks.

15      A.  Rest breaks were never really -- "Did you take

16  your break yet?"  No, it was never -- it was never --

17  that was never something they checked on or asked.

18      Q.  Okay.  It was your responsibility to make sure

19  that you took your breaks on time?

20      A.  Yeah.  And you took them when you wanted to.

21      Q.  Okay.  And you could be coached or disciplined

22  if you skipped a rest break?

23      A.  I imagine so.  I never knew or heard of anybody

24  being written up for it.

25      Q.  Okay.  And no supervisor ever asked you or told

EXHIBIT 16 - PAGE 238

1    you that you needed to skip a rest break, did they

2         A.  Ask me to a skip a break, no.

3         Q.  What about did a supervisor ever tell you to

4    skip a rest break?

5         A.  Skip a rest break?  We were never asked to skip

6    any breaks.  Just sometimes our break time was

7    interrupted or prolonged due to phone calls or team

8    meetings.

9         Q.  Okay.  And now let's talk about meal breaks.

10   You're aware that company policy is that -- we already

11   went over this -- that you were supposed to take your

12   meal breaks.  Correct?

13        A.  Correct.

14        Q.  Okay.  And your supervisor told you you must

15   take your meal breaks.  Correct?

16        A.  Correct.

17             MR. MORPHEW:  Objection.  Misstates prior

18   testimony.

19             THE WITNESS:  Correct.

20   BY MS. MILLER:

21        Q.  Okay.  And if you didn't take your breaks on

22   time your supervisor -- your meal breaks on time, your

23   supervisor would remind you?

24             MR. MORPHEW:  Objection.  Misstates prior

25   testimony.

EXHIBIT 16 - PAGE 239

```
 1              THE WITNESS:  No.
 2   BY MS. MILLER:
 3       Q.  You were responsible for making sure you took
 4   your break before the sixth hour, you said?
 5       A.  Yes, ma'am.
 6       Q.  Okay.  And if you skipped a meal break, you
 7   could be disciplined?
 8       A.  Yes, ma'am.
 9       Q.  Okay.
10              MR. OZMER:  We're coming up on an hour, can we
11   take a break?
12              MS. MILLER:  That's fine.
13              THE VIDEOGRAPHER:  This is the end of media No.
14   2.  The time is 2:55 p.m.  We are now off the record.
15          (Recess taken.)
16              THE VIDEOGRAPHER:  This the beginning of media
17   No. 3 in the deposition of Brent Quick.  The time is 3:03
18   p.m.  We are back on the record.
19   BY MS. MILLER:
20       Q.  All right.  Mr. Quick, during your employment
21   with Time Warner Cable you were paid hourly.  Correct?
22       A.  Hourly plus a sales bonus.
23       Q.  Okay.  And you were paid every two weeks?
24       A.  Yes.
25       Q.  Okay.  And TWC would provide you with a wage
```

EXHIBIT 16 - PAGE 240

```
 1              C E R T I F I C A T E

 2

 3              I, RENEE K. PAPIERNIAK, a Certified Shorthand

 4   Reporter, do hereby certify:

 5              That the foregoing proceedings were taken

 6   before me at the time and place therein set forth,

 7   At which time the witness was put under oath by me;

 8              That the testimony of the witness, the

 9   questions propounded, and all objections and statements

10   made at the time of the examination were recorded

11   stenographically by me and were thereafter transcribed;

12              That the foregoing is a true and correct

13   transcript of my shorthand notes so taken.

14              I further certify that I am not a relative or

15   employee of any attorney of the parties, nor

16   financially interested in the action.

17              I declare under penalty of perjury under the

18   laws of California that the foregoing is true and

19   correct.  Dated this 7th day of January, 2019.

20

21

22

23   _____

24

25   RENEE K. PAPIERNIAK, CSR NO. 7056
```

EXHIBIT 16 - PAGE 241

# EXHIBIT 17

EXHIBIT 17 - PAGE 242





PLAINTIFF'S EXHIBIT 28 PENGAD 800-631-6989 Quick

## TIME KEEPING POLICY ACKNOWLEDGEMENT

Time Warner Cable employees use an electronic timecard system (Kronos) to track their time worked and time off. The actual method of accessing this system (personal computer, telephone, etc.) varies depending upon the department and employee location. All hours worked, benefit and leave time must be accurately reflected on the timecard.

The electronic timecard must be approved at the end of each pay period by both the employee and the supervisor. The "electronic signature" in Kronos acts the same as a written signature, and it indicates that both the employee and the supervisor know what time is entered on the timecard and acknowledge that the time entered is correct. An incorrect timecard should never be approved.

Additionally, Time Warner Cable has a strict time keeping policy regarding nonexempt (hourly) employees. All employees are to take paid rest breaks, 15 minutes for each four hours of work. Employees must also take an unpaid lunch break of 60 minutes during each shift of six hours or more. Employees are never to "punch out" and keep working (otherwise known as "working off the clock"). Working off the clock is strictly prohibited.

Misrepresentation of hours worked, forgery, or other tampering with these records is a violation of the law and any employee found to have engaged in this behavior will be subject to corrective action, up to and including termination of employment.

By signing the below, I acknowledge that I understand Time Warner Cable's Time Keeping Policy. I understand that:

1. I am responsible for monitoring my timecard and keeping it up-to-date during each pay period.
2. I acknowledge that I must take scheduled breaks.
3. I acknowledge that I must approve my timecard at the end of every pay period.
4. I further acknowledge that I must request timecard corrections in writing from my supervisor within one pay period of the date of an error or the date that an error was first noticed.

_Blind_

Employee Signature

_Brent Quick_

Print Employee Name

_SO_

Location

_5/2/20/4_

Date

_5/2/20/4_

Date

_1197623_

PS ID #

Rev. 02/05/2008, 11/6/13

# EXHIBIT 18

EXHIBIT 18 - PAGE 244

# Time Detail

| | |
|---|---|
| Time Period: | 5/02/2014 - 3/25/2016 |
| Query: | Previously Selected Employee(s) |
| Actual/Adjusted: | Show hours worked in this period only. |

| | |
|---|---|
| Data Up to Date: | 8/22/2017 11:42:11 AM |
| Executed on: | 8/22/2017 11:41AM GMT-04:00 |
| Printed for: | P2715215 |
| Insert Page Break After Each Employee worked: | No |

| Date/Time | Apply To | In Punch | In Exc | Out Punch | Out Exc | Override Amount | Adj/Ent Amount | Money Amount | Day Amount | Totaled Amount | Cum. Tot. Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Xfr/Move: Account | | Comment | | | Xfr: Work Rule | | | | | | |
| | | | LE | | | | | | | | |
| 6/19/2014 | | 7:31:00 AM | | 11:30:00 AM | | | | | | 4:00 | 272:15 |
| | | | US | | | | | | | | |
| 6/19/2014 | | 12:31:00 PM | | 4:30:00 PM | | | | | | 4:00 | 276:15 |
| | | | LE | | | | | | | | |
| 6/20/2014 | | 7:30:00 AM | | 12:00:00 PM | | | | | | 4:30 | 280:45 |
| | | | US | | | | | | | | |
| 6/20/2014 | | 1:01:00 PM | | 4:31:00 PM | | | | | | 3:30 | 284:15 |
| | | | LE | | | | | | | | |
| 6/23/2014 | | 7:42:00 AM | | 11:59:00 AM | | | | | | 4:15 | 288:30 |
| | | | US | | | | | | | | |
| 6/23/2014 | | 12:59:00 PM | | 4:31:00 PM | | | | | | 3:30 | 292:00 |
| | | | LE | | | | | | | | |
| 6/23/2014 | 12:00 AM | Leave Without Pay | | | | | 0:15 | | | | 292:15 |
| | | Tardy | | | | | | | | | |
| 6/24/2014 | | 7:30:00 AM | | 11:42:00 AM | | | | | | 4:15 | 296:30 |
| | | | US | | | | | | | | |
| 6/24/2014 | | 12:43:00 PM | | 4:30:00 PM | | | | | | 3:45 | 300:15 |
| | | | LE | | | | | | | | |
| 6/25/2014 | | 7:32:00 AM | | 11:54:00 AM | | | | | | 4:30 | 304:45 |
| | | | US | | | | | | | | |
| 6/25/2014 | | 12:49:00 PM | | 4:34:00 PM | | | | | | 3:30 | 308:15 |
| | | | LE | | | | | | | | |
| 6/26/2014 | | 7:45:00 AM | | 12:00:00 PM | | | | | | 4:15 | 312:30 |
| | | | US | | | | | | | | |
| 6/26/2014 | | 1:00:00 PM | | 8:00:00 PM | | | | | | 7:00 | 319:30 |
| | | | LE | | | | | | | | |
| 6/27/2014 | | 7:30:00 AM | | 11:37:00 AM | | | | | | 4:00 | 323:30 |
| | | | US | | | | | | | | |
| 6/27/2014 | | 12:37:00 PM | | 4:31:00 PM | | | | | | 4:00 | 327:30 |
| | | | LE | | | | | | | | |
| 6/30/2014 | | 7:30:00 AM | | 12:00:00 PM | | | | | | 4:30 | 332:00 |
| | | | US | | | | | | | | |
| 6/30/2014 | | 1:00:00 PM | | 4:30:00 PM | | | | | | 3:30 | 335:30 |
| | | | LE | | | | | | | | |
| 7/1/2014 | | 5:00:00 PM | | 8:58:00 PM | | | | | | 4:00 | 339:30 |
| | | | US | | | | | | | | |

**CONFIDENTIAL**                    **EXHIBIT 18 - PAGE 245**                    QUICK000146

# Time Detail

| | |
|---|---|
| Time Period: | 5/02/2014 - 3/25/2016 |
| Query: | Previously Selected Employee(s) |
| Actual/Adjusted: | Show hours worked in this period only. |

| | |
|---|---|
| Data Up to Date: | 8/22/2017 11:42:11 AM |
| Executed on: | 8/22/2017 11:41AM GMT-04:00 |
| Printed for: | P2715215 |
| Insert Page Break After Each Employee: | No |

| Date/Time | Apply To | In Punch | In Exc | Out Punch | Out Exc | Override Amount | Adj/Ent Amount | Money Amount | Day Amount | Totaled Amount | Cum. Tot. Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Xfr/Move: Account | | Comment | | | Xfr: Work Rule | | | | | | |
| 7/1/2014 | | 9:56:00 PM | | 12:00:00 AM | | | | | | 2:00 | 341:30 |
| | | | LE | | | | | | | | |
| 7/2/2014 | | 12:00:00 AM | | 2:02:00 AM | | | | | | 2:00 | 343:30 |
| 7/2/2014 | | 4:59:00 PM | | 9:04:00 PM | | | | | | 4:00 | 347:30 |
| | | | US | | | | | | | | |
| 7/2/2014 | | 9:55:00 PM | | 12:00:00 AM | | | | | | 2:15 | 349:45 |
| | | | LE | | | | | | | | |
| 7/3/2014 | | 12:00:00 AM | | 2:03:00 AM | | | | | | 2:00 | 351:45 |
| 7/3/2014 | | 5:00:00 PM | | 7:00:00 PM | | | | | | 2:00 | 353:45 |
| | | | US | | | | | | | | |
| | | I: Accelerated Payroll | | | | | | | | | |
| 7/3/2014 | | 8:00:00 PM | | 12:00:00 AM | | | | | | 4:00 | 357:45 |
| | | | LE | | | | | | | | |
| 7/4/2014 | | 4:59:00 PM | | 9:08:00 PM | | | | | | 4:15 | 362:00 |
| | | | US | | | | | | | | |
| 7/4/2014 | | 10:01:00 PM | | 12:00:00 AM | | | | | | 1:45 | 363:45 |
| | | | LE | | | | | | | | |
| 7/4/2014 | 12:00 AM | Holiday No Consec | | | | | 8:00 | | | | 371:45 |
| 7/5/2014 | | 12:00:00 AM | | 2:00:00 AM | | | | | | 2:00 | 373:45 |
| 7/5/2014 | | 4:59:00 PM | | 9:01:00 PM | | | | | | 4:00 | 377:45 |
| | | | US | | | | | | | | |
| 7/5/2014 | | 9:56:00 PM | | 12:00:00 AM | | | | | | 2:00 | 379:45 |
| | | | LE | | | | | | | | |
| 7/6/2014 | | 12:00:00 AM | | 2:18:00 AM | | | | | | 2:15 | 382:00 |
| 7/7/2014 | | 4:59:00 PM | | 9:07:00 PM | | | | | | 4:00 | 386:00 |
| | | | US | | | | | | | | |
| 7/7/2014 | | 9:57:00 PM | | 12:00:00 AM | | | | | | 2:15 | 388:15 |
| | | | LE | | | | | | | | |
| 7/8/2014 | | 12:00:00 AM | | 2:10:00 AM | | | | | | 2:15 | 390:30 |
| 7/8/2014 | | 5:00:00 PM | | 8:28:00 PM | | | | | | 3:30 | 394:00 |
| | | | US | | | | | | | | |
| 7/8/2014 | | 9:28:00 PM | | 12:00:00 AM | | | | | | 2:30 | 396:30 |
| | | | LE | | | | | | | | |
| 7/9/2014 | | 12:00:00 AM | | 2:12:00 AM | | | | | | 2:15 | 398:45 |
| 7/9/2014 | | 4:59:00 PM | | 9:01:00 PM | | | | | | 4:00 | 402:45 |
| | | | US | | | | | | | | |
| 7/9/2014 | | 9:28:00 PM | | 12:00:00 AM | | | | | | 2:30 | 405:15 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Time Period: | | 5/02/2014 - 3/25/2016 | | | | | | Executed on: | | | 8/22/2017 11:41AM GMT-04:00 |
| Query: | | Previously Selected Employee(s) | | | | | | Printed for: | | | P2715215 |
| Actual/Adjusted: | | Show hours worked in this period only. | | | | | | Insert Page Break After Each Employee: | | | No |

| Date/Time | Apply To | In Punch | In Exc | Out Punch | Out Exc | Override Amount | Adj/Ent Amount | Money Amount | Day Amount | Totaled Amount | Cum. Tot. Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| *Xfr/Move: Account* | | *Comment* | | | *Xfr: Work Rule* | | | | | | |
| | | *I: Authorized OT* | | | | | | | | | |
| 7/9/2014 | 12:00 AM | Overtime | | | | | 6:00 | | | | |
| *DB73A14700/1806/310000/150SH30/1086820/000/000* | | | | | | | | | | | |
| 7/10/2014 | | 12:00:00 AM | | 2:12:00 AM | | | | | | 2:15 | 407:30 |
| 7/12/2014 | | 4:59:00 PM | | 9:03:00 PM | | | | | | 4:00 | 411:30 |
| | | | US | | | | | | | | |
| 7/12/2014 | | 9:30:00 PM | | 12:00:00 AM | | | | | | 2:30 | 414:00 |
| | | *I: Authorized OT* | | | | | | | | | |
| 7/13/2014 | | 12:00:00 AM | | 2:02:00 AM | | | | | | 2:00 | 416:00 |
| 7/13/2014 | | 4:58:00 PM | | 9:01:00 PM | | | | | | 4:00 | 420:00 |
| | | | US | | | | | | | | |
| 7/13/2014 | | 10:00:00 PM | | 12:00:00 AM | | | | | | 2:00 | 422:00 |
| | | | LE | | | | | | | | |
| 7/14/2014 | | 12:00:00 AM | | 2:50:00 AM | | | | | | 2:45 | 424:45 |
| 7/14/2014 | | 4:58:00 PM | | 9:32:00 PM | | | | | | 4:30 | 429:15 |
| | | | US | | | | | | | | |
| 7/14/2014 | | 10:30:00 PM | | 12:00:00 AM | | | | | | 1:30 | 430:45 |
| | | | LE | | | | | | | | |
| 7/15/2014 | | 12:00:00 AM | | 2:00:00 AM | | | | | | 2:00 | 432:45 |
| 7/15/2014 | | 5:00:00 PM | | 9:03:00 PM | | | | | | 4:00 | 436:45 |
| | | | US | | | | | | | | |
| 7/15/2014 | | 9:58:00 PM | | 12:00:00 AM | | | | | | 2:00 | 438:45 |
| | | | LE | | | | | | | | |
| 7/16/2014 | | 12:00:00 AM | | 2:00:00 AM | | | | | | 2:00 | 440:45 |
| 7/16/2014 | | 5:00:00 PM | | 9:10:00 PM | | | | | | 4:15 | 445:00 |
| | | | US | | | | | | | | |
| 7/16/2014 | | 10:01:00 PM | | 12:00:00 AM | | | | | | 2:00 | 447:00 |
| | | | LE | | | | | | | | |
| 7/17/2014 | | 12:00:00 AM | | 2:08:00 AM | | | | | | 2:15 | 449:15 |
| 7/19/2014 | | 4:56:00 PM | | 9:02:00 PM | | | | | | 4:00 | 453:15 |
| | | | US | | | | | | | | |
| 7/19/2014 | | 9:59:00 PM | | 12:00:00 AM | | | | | | 2:00 | 455:15 |
| | | | LE | | | | | | | | |
| 7/20/2014 | | 12:00:00 AM | | 2:12:00 AM | | | | | | 2:15 | 457:30 |
| 7/20/2014 | | 5:00:00 PM | | 9:14:00 PM | | | | | | 4:15 | 461:45 |
| | | | US | | | | | | | | |
| 7/20/2014 | | 10:01:00 PM | | 12:00:00 AM | | | | | | 2:00 | 463:45 |

**CONFIDENTIAL**

**EXHIBIT 18 - PAGE 247**

QUICK000148

| Time Period: | 5/02/2014 - 3/25/2016 | | | | | | | | Data Up to Date: | | 8/22/2017 11:42:11 AM |
| Query: | Previously Selected Employee(s) | | | | | | | | Executed on: | | 8/22/2017 11:41AM GMT-04:00 |
| Actual/Adjusted: | Show hours worked in this period only. | | | | | | | | Printed for: | | P2715215 |
| | | | | | | | | | Insert Page Break After Each Employee: | | No |

| Date/Time | Apply To | In Punch | In Exc | Out Punch | Out Exc | Override Amount | Adj/Ent Amount | Money Amount | Day Amount | Totaled Amount | Cum. Tot. Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| *Xfr/Move: Account* | | *Comment* | | | *Xfr: Work Rule* | | | | | | |
| | | | LE | | | | | | | | |
| 7/21/2014 | | 12:00:00 AM | | 2:25:00 AM | | | | | | 2:30 | 466:15 |
| 7/21/2014 | | 4:59:00 PM | | 9:14:00 PM | | | | | | 4:15 | 470:30 |
| | | | US | | | | | | | | |
| 7/21/2014 | | 9:59:00 PM | | 12:00:00 AM | | | | | | 2:00 | 472:30 |
| | | | LE | | | | | | | | |
| 7/22/2014 | | 12:00:00 AM | | 2:16:00 AM | | | | | | 2:15 | 474:45 |
| 7/22/2014 | | 5:01:00 PM | | 9:00:00 PM | | | | | | 4:00 | 478:45 |
| | | | US | | | | | | | | |
| 7/22/2014 | | 9:31:00 PM | | 12:00:00 AM | | | | | | 2:30 | 481:15 |
| 7/23/2014 | | 12:00:00 AM | | 2:15:00 AM | | | | | | 2:15 | 483:30 |
| 7/23/2014 | | 5:00:00 PM | | 8:59:00 PM | | | | | | 4:00 | 487:30 |
| | | | US | | | | | | | | |
| 7/23/2014 | | 9:30:00 PM | | 12:00:00 AM | | | | | | 2:30 | 490:00 |
| 7/24/2014 | | 12:00:00 AM | | 2:02:00 AM | | | | | | 2:00 | 492:00 |
| 7/26/2014 | | 5:01:00 PM | | 9:00:00 PM | | | | | | 4:00 | 496:00 |
| | | | US | | | | | | | | |
| 7/26/2014 | | 9:30:00 PM | | 12:00:00 AM | | | | | | 2:30 | 498:30 |
| 7/27/2014 | | 12:00:00 AM | | 2:00:00 AM | | | | | | 2:00 | 500:30 |
| 7/27/2014 | | 4:58:00 PM | | 9:01:00 PM | | | | | | 4:00 | 504:30 |
| | | | US | | | | | | | | |
| 7/27/2014 | | 9:28:00 PM | | 12:00:00 AM | | | | | | 2:30 | 507:00 |
| 7/28/2014 | | 12:00:00 AM | | 2:00:00 AM | | | | | | 2:00 | 509:00 |
| 7/28/2014 | | 4:57:00 PM | | 9:01:00 PM | | | | | | 4:00 | 513:00 |
| | | | US | | | | | | | | |
| 7/28/2014 | | 10:00:00 PM | | 12:00:00 AM | | | | | | 2:00 | 515:00 |
| | | | LE | | | | | | | | |
| 7/29/2014 | | 12:00:00 AM | | 2:00:00 AM | | | | | | 2:00 | 517:00 |
| 7/29/2014 | | 4:59:00 PM | | 9:08:00 PM | | | | | | 4:15 | 521:15 |
| | | | US | | | | | | | | |
| 7/29/2014 | | 9:59:00 PM | | 12:00:00 AM | | | | | | 2:00 | 523:15 |
| | | | LE | | | | | | | | |
| 7/30/2014 | | 12:00:00 AM | | 2:07:00 AM | | | | | | 2:00 | 525:15 |
| 7/30/2014 | | 5:37:00 PM | | 9:12:00 PM | | | | | | 3:45 | 529:00 |
| | | | US | | | | | | | | |
| *I: Tardy* | | | | | | | | | | | |

Time Period:                5/02/2014 - 3/25/2016              Data Up to Date:          8/22/2017 11:42:11 AM
Query:                      Previously Selected Employee(s)     Executed on:             8/22/2017 11:41AM GMT-04:00
Actual/Adjusted:            Show hours worked in this period only.  Printed for:          P2715215
                                                                   Insert Page Break After Each Employee:     No

| Date/Time | Apply To | In Punch | In Exc | Out Punch | Out Exc | Override Amount | Adj/Ent Amount | Money Amount | Day Amount | Totaled Amount | Cum. Tot. Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Xfr/Move: Account | | Comment | | | Xfr: Work Rule | | | | | | |
| 7/30/2014 | | 10:02:00 PM | | 12:00:00 AM | | | | | | 2:00 | 531:00 |
| | | | LE | | | | | | | | |
| 7/30/2014 | 12:00 AM | Leave Without Pay | | | | | 0:15 | | | | 531:15 |
| 7/31/2014 | | 12:00:00 AM | | 2:00:00 AM | | | | | | 2:00 | 533:15 |
| 8/2/2014 | | 4:57:00 PM | | 8:45:00 PM | | | | | | 3:45 | 537:00 |
| | | | US | | | | | | | | |
| 8/2/2014 | | 9:44:00 PM | | 12:00:00 AM | | | | | | 2:15 | 539:15 |
| | | | LE | | | | | | | | |
| 8/3/2014 | | 12:00:00 AM | | 2:05:00 AM | | | | | | 2:00 | 541:15 |
| 8/3/2014 | | 4:58:00 PM | | 9:00:00 PM | | | | | | 4:00 | 545:15 |
| | | | US | | | | | | | | |
| 8/3/2014 | | 10:00:00 PM | | 12:00:00 AM | | | | | | 2:00 | 547:15 |
| | | | LE | | | | | | | | |
| 8/4/2014 | | 12:00:00 AM | | 2:00:00 AM | | | | | | 2:00 | 549:15 |
| 8/4/2014 | | 4:56:00 PM | | 9:03:00 PM | | | | | | 4:00 | 553:15 |
| | | | US | | | | | | | | |
| 8/4/2014 | | 10:01:00 PM | | 12:00:00 AM | | | | | | 2:00 | 555:15 |
| | | | LE | | | | | | | | |
| 8/5/2014 | | 12:00:00 AM | | 2:09:00 AM | | | | | | 2:15 | 557:30 |
| 8/5/2014 | | 4:56:00 PM | | 8:59:00 PM | | | | | | 4:00 | 561:30 |
| | | | US | | | | | | | | |
| 8/5/2014 | | 9:59:00 PM | | 12:00:00 AM | | | | | | 2:00 | 563:30 |
| | | | LE | | | | | | | | |
| 8/6/2014 | | 12:00:00 AM | | 2:00:00 AM | | | | | | 2:00 | 565:30 |
| 8/6/2014 | 12:00 AM | Sick Time | | | | | 8:00 | | | | 573:30 |
| 8/9/2014 | | 5:00:00 PM | | 9:00:00 PM | | | | | | 4:00 | 577:30 |
| | | | US | | | | | | | | |
| 8/9/2014 | | 10:00:00 PM | | 12:00:00 AM | | | | | | 2:00 | 579:30 |
| | | | LE | | | | | | | | |
| 8/10/2014 | | 12:00:00 AM | | 2:00:00 AM | | | | | | 2:00 | 581:30 |
| 8/10/2014 | | 5:02:00 PM | | 9:04:00 PM | | | | | | 4:00 | 585:30 |
| | | | US | | | | | | | | |
| 8/10/2014 | | 10:00:00 PM | | 12:00:00 AM | | | | | | 2:00 | 587:30 |
| | | | LE | | | | | | | | |
| 8/11/2014 | | 12:00:00 AM | | 2:00:00 AM | | | | | | 2:00 | 589:30 |
| 8/11/2014 | | 4:58:00 PM | | 8:59:00 PM | | | | | | 4:00 | 593:30 |
| | | | US | | | | | | | | |

# EXHIBIT 19

EXHIBIT 19 - PAGE 250

| | | | | | | | Data Up to Date: | 8/22/2017 11:20:37 AM |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Time Period: | | 12/23/2011 – 5/13/2016 | | | | | Executed on: | 8/22/2017 11:20AM GMT-04:00 |
| Query: | | Previously Selected Employee(s) | | | | | Printed for: | P2715215 |
| Actual/Adjusted: | | Show hours worked in this period only. | | | | | Insert Page Break After Each Employee: | No |

| Date/Time | Apply To | In Punch | In Exc | Out Punch | Out Exc | Override Amount | Adj/Ent Amount | Money Amount | Day Amount | Totaled Amount | Cum. Tot. Amount |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Xfr/Move: Account | | | Comment | | Xfr: Work Rule | | | | | | |

# REDACTED

| Date/Time | Apply To | In Punch | In Exc | Out Punch | Out Exc | Override Amount | Adj/Ent Amount | Money Amount | Day Amount | Totaled Amount | Cum. Tot. Amount |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 4/20/2013 | | 12:00:00 AM | | 12:34:00 AM | | | | | | 0:30 | 2870:15 |
| | | | | | LV | | | | | | |
| 4/22/2013 | | 3:29:00 PM | | 7:40:00 PM | | | | | | 4:15 | 2874:30 |
| | | | | | US | | | | | | |
| 4/22/2013 | | 8:35:00 PM | | 12:00:00 AM | | | | | | 3:15 | 2877:45 |
| | | | | | LE | | | | | | |
| 4/23/2013 | | 12:00:00 AM | | 12:32:00 AM | | | | | | 0:30 | 2878:15 |
| 4/23/2013 | 12:00 AM | ADMN-Personal Time | | | | | 8:00 | | | | 2886:15 |
| 4/24/2013 | 12:00 AM | ADMN-Leave Without Pay | | | | | 8:00 | | | | 2894:15 |
| 4/26/2013 | 12:00 AM | ADMN-Leave Without Pay | | | | | 8:00 | | | | 2902:15 |
| 4/27/2013 | 12:00 AM | ADMN-Leave Without Pay | | | | | 8:00 | | | | 2910:15 |
| 4/30/2013 | 12:00 AM | ADMN-Leave Without Pay | | | | | 0:30 | | | | 2910:45 |
| 4/30/2013 | 12:00 AM | ADMN-Personal Time | | | | | 0:30 | | | | 2911:15 |
| 4/30/2013 | 12:00 AM | ADMN-Sick Time | | | | | 7:00 | | | | 2918:15 |
| 5/6/2013 | | 3:25:00 PM | | 7:30:00 PM | | | | | | 4:00 | 2922:15 |
| | | | | | US | | | | | | |
| 5/6/2013 | | 8:33:00 PM | | 12:00:00 AM | | | | | | 3:30 | 2925:45 |
| | | | | | LE | | | | | | |
| 5/7/2013 | | 12:00:00 AM | | 12:31:00 AM | | | | | | 0:30 | 2926:15 |
| 5/7/2013 | | 3:26:00 PM | | 7:30:00 PM | | | | | | 4:00 | 2930:15 |
| | | | | | LV | | | | | | |
| 5/7/2013 | | 8:29:00 PM | | 12:00:00 AM | | | | | | 3:30 | 2933:45 |

# Time Detail

| | | | | | | |
|---|---|---|---|---|---|---|
| Time Period: | 12/23/2011 - 5/13/2016 | | | | Data Up to Date: | 8/22/2017 11:20:37 AM |
| Query: | Previously Selected Employee(s) | | | | Executed on: | 8/22/2017 11:20AM GMT-04:00 |
| Actual/Adjusted: | Show hours worked in this period only. | | | | Printed for: | P2715215 |
| | | | | | Insert Page Break After Each Employee: | No |

| Date/Time | Apply To | In Punch | In Exc | Out Punch | Out Exc | Override Amount | Adj/Ent Amount | Money Amount | Day Amount | Totaled Amount | Cum. Tot. Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Xfr/Move: Account | | Comment | | | Xfr: Work Rule | | | | | | |
| | | | LE | | | | | | | | |
| 5/8/2013 | | 12:00:00 AM | | 12:32:00 AM | | | | | | 0:30 | 2934:15 |
| | | | | | LV | | | | | | |
| 5/8/2013 | | 3:13:00 PM | | 8:10:00 PM | | | | | | 5:00 | 2939:15 |
| | | | LV | | | | | | | | |
| 5/8/2013 | | 9:10:00 PM | | 12:00:00 AM | | | | | | 2:45 | 2942:00 |
| | | | LE | | | | | | | | |
| 5/9/2013 | | 12:00:00 AM | | 12:31:00 AM | | | | | | 0:30 | 2942:30 |
| | | | | | LV | | | | | | |
| 5/9/2013 | | 3:26:00 PM | | 7:31:00 PM | | | | | | 4:00 | 2946:30 |
| | | | LV | | | | | | | | |
| 5/9/2013 | | 8:33:00 PM | | 9:40:00 PM | | | | | | 1:15 | 2947:45 |
| | | | LE | | EV | | | | | | |
| 5/9/2013 | 12:00 AM | Other Un-worked Pay (historical date: 4/25/2013) | | | | | 8:00 | | | | |
| DB73A19510/1806/310000/150SH30/1134442/000/000 | | | | | | | | | | | |
| 5/9/2013 | 12:00 AM | Overtime (historical date: 4/12/2013) | | | | | -0:15 | | | | |
| DB73A19510/1806/310000/150SH30/1135914/000/000 | | | | | | | | | | | |
| 5/9/2013 | 12:00 AM | Regular (historical date: 4/12/2013) | | | | | -0:30 | | | | |
| DB73A19510/1806/310000/150SH30/1135914/000/000 | | | | | | | | | | | |
| 5/9/2013 | 12:00 AM | Shift2 (historical date: 4/12/2013) | | | | | -0:30 | | | | |
| DB73A19510/1806/310000/150SH30/1135914/000/000 | | | | | | | | | | | |
| 5/10/2013 | 12:00 AM | ADMN-Leave Without Pay | | | | | 8:00 | | | | 2955:45 |
| 5/11/2013 | 12:00 AM | ADMN-Leave Without Pay | | | | | 8:00 | | | | 2963:45 |
| 5/13/2013 | | 3:27:00 PM | | 7:27:00 PM | | | | | | 4:00 | 2967:45 |
| | | | US | | | | | | | | |
| 5/13/2013 | | 8:26:00 PM | | 12:00:00 AM | | | | | | 3:30 | 2971:15 |
| | | | LE | | | | | | | | |
| 5/14/2013 | | 12:00:00 AM | | 12:35:00 AM | | | | | | 0:30 | 2971:45 |
| 5/14/2013 | | 3:31:00 PM | | 7:26:00 PM | | | | | | 4:00 | 2975:45 |
| | | | LV | | | | | | | | |
| 5/14/2013 | | 8:26:00 PM | | 12:00:00 AM | | | | | | 3:30 | 2979:15 |
| | | | LE | | | | | | | | |
| 5/15/2013 | | 12:00:00 AM | | 12:34:00 AM | | | | | | 0:30 | 2979:45 |
| | | | | | LV | | | | | | |
| 5/15/2013 | | 3:27:00 PM | | 8:00:00 PM | | | | | | 4:30 | 2984:15 |
| | | | LV | | | | | | | | |
| 5/15/2013 | | 9:00:00 PM | | 12:00:00 AM | | | | | | 3:00 | 2987:15 |
| | | | LE | | | | | | | | |

# Time Detail

| | |
|---|---|
| Time Period: | 12/23/2011 – 5/13/2016 |
| Query: | Previously Selected Employee(s) |
| Actual/Adjusted: | Show hours worked in this period only. |

| | |
|---|---|
| Data Up to Date: | 8/22/2017 11:20:37 AM |
| Executed on: | 8/22/2017 11:20AM GMT-04:00 |
| Printed for: | P2715215 |
| Insert Page Break After Each Employee: | No |

| Date/Time | Apply To | In Punch | In Exc | Out Punch | Out Exc | Override Amount | Adj/Ent Amount | Money Amount | Day Amount | Totaled Amount | Cum. Tot. Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Xfr/Move: Account | | | Comment | | Xfr: Work Rule | | | | | | |
| 5/16/2013 | | 12:00:00 AM | | 12:30:00 AM | | | | | | 0:30 | 2987:45 |
| | | | | | LV | | | | | | |
| 5/16/2013 | | 3:26:00 PM | | 7:41:00 PM | | | | | | 4:15 | 2992:00 |
| | | | LV | | | | | | | | |
| 5/16/2013 | | 8:42:00 PM | | 12:00:00 AM | | | | | | 3:15 | 2995:15 |
| | | | LE | | | | | | | | |
| 5/17/2013 | | 12:00:00 AM | | 12:37:00 AM | | | | | | 0:30 | 2995:45 |
| | | | | | LV | | | | | | |
| 5/17/2013 | | 3:28:00 PM | | 8:35:00 PM | | | | | | 5:00 | 3000:45 |
| | | | LV | | | | | | | | |
| 5/17/2013 | | 9:35:00 PM | | 12:00:00 AM | | | | | | 2:30 | 3003:15 |
| | | | LE | | | | | | | | |
| 5/18/2013 | | 12:00:00 AM | | 12:44:00 AM | | | | | | 0:45 | 3004:00 |
| | | | | | LV | | | | | | |
| 5/20/2013 | | 3:25:00 PM | | 7:27:00 PM | | | | | | 4:00 | 3008:00 |
| | | | US | | | | | | | | |
| 5/20/2013 | | 8:26:00 PM | | 12:00:00 AM | | | | | | 3:30 | 3011:30 |
| | | | LE | | | | | | | | |
| 5/21/2013 | | 12:00:00 AM | | 12:37:00 AM | | | | | | 0:30 | 3012:00 |
| 5/21/2013 | | 3:25:00 PM | | 7:38:00 PM | | | | | | 4:15 | 3016:15 |
| | | | LV | | | | | | | | |
| 5/21/2013 | | 8:40:00 PM | | 12:00:00 AM | | | | | | 3:15 | 3019:30 |
| | | | LE | | | | | | | | |
| 5/22/2013 | | 12:00:00 AM | | 12:30:00 AM | | | | | | 0:30 | 3020:00 |
| | | | | | LV | | | | | | |
| 5/22/2013 | | 3:25:00 PM | | 7:50:00 PM | | | | | | 4:15 | 3024:15 |
| | | | LV | | | | | | | | |
| 5/22/2013 | | 8:38:00 PM | | 12:00:00 AM | | | | | | 3:30 | 3027:45 |
| | | | LE | | | | | | | | |
| 5/23/2013 | | 12:00:00 AM | | 12:37:00 AM | | | | | | 0:30 | 3028:15 |
| | | | | | LV | | | | | | |
| 5/23/2013 | | 3:25:00 PM | | 7:30:00 PM | | | | | | 4:00 | 3032:15 |
| | | | LV | | | | | | | | |
| 5/23/2013 | | 8:30:00 PM | | 12:00:00 AM | | | | | | 3:30 | 3035:45 |
| | | | LE | | | | | | | | |
| 5/24/2013 | | 12:00:00 AM | | 12:30:00 AM | | | | | | 0:30 | 3036:15 |
| | | | | | LV | | | | | | |

# Time Detail

Case 3:17-cv-01513-DMS-AGS  Document 60-5  Filed 07/26/19  PageID.1252  Page 125 of 154

| | |
|---|---|
| Time Period: | 12/23/2011 – 5/13/2016 |
| Query: | Previously Selected Employee(s) |
| Actual/Adjusted: | Show hours worked in this period only. |

Data Up to Date: 8/22/2017 11:20:37 AM
Executed on: 8/22/2017 11:20AM GMT-04:00
Printed for: P2715215
Insert Page Break After Each Employee: No

| Date/Time | Apply To | In Punch | In Exc | Out Punch | Out Exc | Override Amount | Adj/Ent Amount | Money Amount | Day Amount | Totaled Amount | Cum. Tot. Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Xfr/Move: Account | | | Comment | | Xfr: Work Rule | | | | | | |
| 5/24/2013 | | 3:31:00 PM | | 7:25:00 PM | | | | | | 4:00 | 3040:15 |
| | | | LV | | | | | | | | |
| 5/24/2013 | | 8:28:00 PM | | 12:00:00 AM | | | | | | 3:30 | 3043:45 |
| | | | LE | | | | | | | | |
| 5/25/2013 | | 12:00:00 AM | | 12:30:00 AM | | | | | | 0:30 | 3044:15 |
| | | | | | LV | | | | | | |
| 5/27/2013 | | 3:25:00 PM | | 7:48:00 PM | | | | | | 4:15 | 3048:30 |
| | | | US | | | | | | | | |
| 5/27/2013 | | 8:47:00 PM | | 12:00:00 AM | | | | | | 3:15 | 3051:45 |
| | | | LE | | | | | | | | |
| 5/27/2013 | 12:00 AM | Holiday No Consec | | | | | 8:00 | | | | 3059:45 |
| 5/28/2013 | | 12:00:00 AM | | 12:30:00 AM | | | | | | 0:30 | 3060:15 |
| 5/28/2013 | | 3:25:00 PM | | 7:32:00 PM | | | | | | 4:00 | 3064:15 |
| | | | LV | | | | | | | | |
| 5/28/2013 | | 8:31:00 PM | | 12:00:00 AM | | | | | | 3:30 | 3067:45 |
| | | | LE | | | | | | | | |
| 5/29/2013 | | 12:00:00 AM | | 12:30:00 AM | | | | | | 0:30 | 3068:15 |
| | | | | | LV | | | | | | |
| 5/29/2013 | | 3:25:00 PM | | 7:25:00 PM | | | | | | 4:00 | 3072:15 |
| | | | LV | | | | | | | | |
| 5/29/2013 | | 8:25:00 PM | | 12:00:00 AM | | | | | | 3:30 | 3075:45 |
| | | | LE | | | | | | | | |
| 5/30/2013 | | 12:00:00 AM | | 12:30:00 AM | | | | | | 0:30 | 3076:15 |
| | | | | | LV | | | | | | |
| 5/30/2013 | | 3:30:00 PM | | 7:28:00 PM | | | | | | 4:00 | 3080:15 |
| | | | LV | | | | | | | | |
| 5/30/2013 | | 8:27:00 PM | | 12:00:00 AM | | | | | | 3:30 | 3083:45 |
| | | | LE | | | | | | | | |
| 5/30/2013 | 12:00 AM | Overtime | | | | | 8:00 | | | | 3084:30 |
| 5/31/2013 | | 12:00:00 AM | | 12:44:00 AM | | | | | | 0:45 | 3084:30 |
| | | | LV | | | | | | | | |
| 5/31/2013 | | 3:25:00 PM | | 7:32:00 PM | | | | | | 4:00 | 3088:30 |
| | | | LV | | | | | | | | |
| 5/31/2013 | | 8:34:00 PM | | 12:00:00 AM | | | | | | 3:30 | 3092:00 |
| | | | LE | | | | | | | | |
| 6/1/2013 | | 12:00:00 AM | | 12:30:00 AM | | | | | | 0:30 | 3092:30 |
| | | | | | LV | | | | | | |

# EXHIBIT 20

EXHIBIT 20 - PAGE 255

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Time Period: | | | 12/23/2011 - 8/27/2014 | | | | | Data Up-to-Date: | | | 8/22/2017 11:34:49 AM |
| Query: | | | Previously Selected Employee(s) | | | | | Executed on: | | | 8/22/2017 11:34AM GMT-04:00 |
| Actual/Adjusted: | | | Show hours worked in this period only. | | | | | Printed for: | | | P2715215 |
| | | | | | | | | Insert Page Break After Each Employee: | | | No |

| Date/Time | Apply To | In Punch | In Exc | Out Punch | Out Exc | Override Amount | Adj/Ent Amount | Money Amount | Day Amount | Totaled Amount | Cum. Tot. Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Xfr/Move: Account | | Comment | | | Xfr: Work Rule | | | | | | |
| 6/19/2013 | | 6:35:00 PM | | 10:34:00 PM | | | | | | 4:00 | 2214:45 |
| 6/20/2013 | | 1:29:00 PM | | 5:29:00 PM | | | | | | 4:00 | 2218:45 |
| | | | US | | | | | | | | |
| 6/20/2013 | | 6:28:00 PM | | 10:32:00 PM | | | | | | 4:00 | 2222:45 |
| 6/21/2013 | 12:00 AM | Personal Time No Consec | | | | | 8:00 | | | | 2230:45 |
| 6/22/2013 | 12:00 AM | Leave Without Pay | | | | | 1:30 | | | | 2232:15 |
| | | Approved | | | | | | | | | |
| 6/22/2013 | 12:00 AM | Vacation No Consec | | | | | 6:30 | | | | 2238:45 |
| 6/25/2013 | | 1:30:00 PM | | 5:29:00 PM | | | | | | 4:00 | 2242:45 |
| | | | US | | | | | | | | |
| 6/25/2013 | | 6:30:00 PM | | 10:30:00 PM | | | | | | 4:00 | 2246:45 |
| 6/26/2013 | | 1:28:00 PM | | 5:39:00 PM | | | | | | 4:15 | 2251:00 |
| | | | US | | | | | | | | |
| 6/26/2013 | | 6:37:00 PM | | 10:32:00 PM | | | | | | 3:45 | 2254:45 |
| 6/27/2013 | | 1:22:00 PM | | 5:31:00 PM | | | | | | 4:15 | 2259:00 |
| | | | US | | | | | | | | |
| 6/27/2013 | | 6:30:00 PM | | 10:33:00 PM | | | | | | 4:00 | 2263:00 |
| 6/28/2013 | | 1:28:00 PM | | 5:35:00 PM | | | | | | 4:00 | 2267:00 |
| | | | US | | | | | | | | |
| 6/28/2013 | | 6:32:00 PM | | 10:30:00 PM | | | | | | 4:00 | 2271:00 |
| 6/29/2013 | | 1:29:00 PM | | 4:08:00 PM | | | | | | 2:45 | 2273:45 |
| | | | US | | | | | | | | |
| 6/29/2013 | | 5:00:00 PM | | 10:30:00 PM | | | | | | 5:30 | 2279:15 |
| 7/2/2013 | | 1:27:00 PM | | 5:55:00 PM | | | | | | 4:30 | 2283:45 |
| | | | US | | | | | | | | |
| 7/2/2013 | | 6:53:00 PM | | 10:31:00 PM | | | | | | 3:30 | 2287:15 |
| 7/3/2013 | | 1:25:00 PM | | 5:23:00 PM | | | | | | 4:00 | 2291:15 |
| | | | US | | | | | | | | |
| 7/3/2013 | | 6:20:00 PM | | 10:30:00 PM | | | | | | 4:00 | 2295:15 |
| 7/4/2013 | | 1:27:00 PM | | 5:28:00 PM | | | | | | 4:00 | 2299:15 |
| | | | US | | | | | | | | |
| 7/4/2013 | | 6:26:00 PM | | 10:30:00 PM | | | | | | 4:00 | 2303:15 |
| 7/4/2013 | 12:00 AM | Holiday No Consec | | | | | 8:00 | | | | 2311:15 |
| | | Independence Day | | | | | | | | | |
| 7/4/2013 | 12:00 AM | Overtime | | | | | 8:00 | | | | |
| 7/5/2013 | | 1:23:00 PM | | 5:38:00 PM | | | | | | 4:15 | 2315:30 |
| | | | US | | | | | | | | |

| Time Period: | 12/23/2011 - 8/27/2014 | Data Up to Date: | 8/22/2017 11:34:49 AM |
| Query: | Previously Selected Employee(s) | Executed on: | 8/22/2017 11:34AM GMT-04:00 |
| Actual/Adjusted: | Show hours worked in this period only. | Printed for: | P2715215 |
| | | Insert Page Break After Each Employee: | No |

| Date/Time | Apply To | In Punch | In Exc | Out Punch | Out Exc | Override Amount | Adj/Ent Amount | Money Amount | Day Amount | Totaled Amount | Cum. Tot. Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| *Xfr/Move: Account* | | *Comment* | | | *Xfr: Work Rule* | | | | | | |
| 7/5/2013 | | 6:36:00 PM | | 10:31:00 PM | | | | | | 3:45 | 2319:15 |
| 7/6/2013 | | 1:29:00 PM | | 5:28:00 PM | | | | | | 4:00 | 2323:15 |
| | | | US | | | | | | | | |
| 7/6/2013 | | 6:31:00 PM | | 10:30:00 PM | | | | | | 4:00 | 2327:15 |
| 7/9/2013 | | 1:25:00 PM | | 5:33:00 PM | | | | | | 4:00 | 2331:15 |
| | | | US | | | | | | | | |
| 7/9/2013 | | 6:33:00 PM | | 10:30:00 PM | | | | | | 4:00 | 2335:15 |
| 7/10/2013 | | 1:23:00 PM | | 5:40:00 PM | | | | | | 4:15 | 2339:30 |
| | | | US | | | | | | | | |
| 7/10/2013 | | 6:42:00 PM | | 10:31:00 PM | | | | | | 3:45 | 2343:15 |
| 7/11/2013 | | 1:26:00 PM | | 5:29:00 PM | | | | | | 4:00 | 2347:15 |
| | | | US | | | | | | | | |
| 7/11/2013 | | 6:27:00 PM | | 10:30:00 PM | | | | | | 4:00 | 2351:15 |
| 7/12/2013 | 12:00 AM | Leave Without Pay | | | | | 8:00 | | | | 2359:15 |
| | | *Not Approved* | | | | | | | | | |
| 7/13/2013 | 12:00 AM | Leave Without Pay | | | | | 8:00 | | | | 2367:15 |
| | | *Not Approved* | | | | | | | | | |
| 7/16/2013 | | 1:24:00 PM | | 5:31:00 PM | | | | | | 4:00 | 2371:15 |
| | | | US | | | | | | | | |
| 7/16/2013 | | 6:28:00 PM | | 10:35:00 PM | | | | | | 4:00 | 2375:15 |
| 7/17/2013 | | 1:28:00 PM | | 5:29:00 PM | | | | | | 4:00 | 2379:15 |
| | | | US | | | | | | | | |
| 7/17/2013 | | 6:28:00 PM | | 10:30:00 PM | | | | | | 4:00 | 2383:15 |
| 7/18/2013 | | 1:29:00 PM | | 5:38:00 PM | | | | | | 4:15 | 2387:30 |
| | | | US | | | | | | | | |
| 7/18/2013 | | 6:35:00 PM | | 10:30:00 PM | | | | | | 3:45 | 2391:15 |
| 7/19/2013 | | 1:28:00 PM | | 5:32:00 PM | | | | | | 4:00 | 2395:15 |
| | | | US | | | | | | | | |
| 7/19/2013 | | 6:31:00 PM | | 10:30:00 PM | | | | | | 4:00 | 2399:15 |
| 7/20/2013 | | 1:27:00 PM | | 5:30:00 PM | | | | | | 4:00 | 2403:15 |
| | | | US | | | | | | | | |
| | | *O: Forgot to Punch* | | | | | | | | | |
| 7/20/2013 | | 6:30:00 PM | | 10:30:00 PM | | | | | | 4:00 | 2407:15 |
| | | *I: Forgot to Punch* | | | | | | | | | |
| 7/23/2013 | | 1:30:00 PM | | 5:48:00 PM | | | | | | 4:15 | 2411:30 |
| | | | US | | | | | | | | |

**CONFIDENTIAL**                                 **EXHIBIT 20 - PAGE 257**                                 **GIBBS000161**

# Time Detail

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Time Period: | | 12/23/2011 - 8/27/2014 | | | | | | Data Up to Date: | | | 8/22/2017 11:34:49 AM | |
| Query: | | Previously Selected Employee(s) | | | | | | Executed on: | | | 8/22/2017 11:34AM GMT-04:00 | |
| Actual/Adjusted: | | Show hours worked in this period only. | | | | | | Printed for: | | | P2715215 | |
| | | | | | | | | Insert Page Break After Each Employee: | | | No | |

| Date/Time | Apply To | In Punch | In Exc | Out Punch | Out Exc | Override Amount | Adj/Ent Amount | Money Amount | Day Amount | Totaled Amount | Cum. Tot. Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Xfr/Move: Account | | | Comment | | Xfr: Work Rule | | | | | | |
| 7/23/2013 | | 6:45:00 PM | | 10:30:00 PM | | | | | | 3:45 | 2415:15 |
| 7/24/2013 | | 1:23:00 PM | | 5:31:00 PM | | | | | | 4:00 | 2419:15 |
| | | | US | | | | | | | | |
| 7/24/2013 | | 6:30:00 PM | | 10:30:00 PM | | | | | | 4:00 | 2423:15 |
| 7/25/2013 | | 1:27:00 PM | | 5:36:00 PM | | | | | | 4:00 | 2427:15 |
| | | | US | | | | | | | | |
| 7/25/2013 | | 6:34:00 PM | | 10:30:00 PM | | | | | | 4:00 | 2431:15 |
| 7/26/2013 | | 1:28:00 PM | | 5:38:00 PM | | | | | | 4:15 | 2435:30 |
| | | | US | | | | | | | | |
| 7/26/2013 | | 6:36:00 PM | | 10:30:00 PM | | | | | | 3:45 | 2439:15 |
| 7/27/2013 | | 1:25:00 PM | | 5:28:00 PM | | | | | | 4:00 | 2443:15 |
| | | | US | | | | | | | | |
| 7/27/2013 | | 6:26:00 PM | | 10:30:00 PM | | | | | | 4:00 | 2447:15 |
| 7/30/2013 | | 1:29:00 PM | | 5:37:00 PM | | | | | | 4:00 | 2451:15 |
| | | | US | | | | | | | | |
| 7/30/2013 | | 6:35:00 PM | | 10:30:00 PM | | | | | | 4:00 | 2455:15 |
| 7/31/2013 | | 1:28:00 PM | | 5:36:00 PM | | | | | | 4:00 | 2459:15 |
| | | | US | | | | | | | | |
| 7/31/2013 | | 6:32:00 PM | | 10:30:00 PM | | | | | | 4:00 | 2463:15 |
| 8/1/2013 | | 1:28:00 PM | | 5:22:00 PM | | | | | | 3:45 | 2467:00 |
| | | | US | | | | | | | | |
| 8/1/2013 | | 6:21:00 PM | | 10:30:00 PM | | | | | | 4:15 | 2471:15 |
| 8/2/2013 | | 1:28:00 PM | | 5:39:00 PM | | | | | | 4:15 | 2475:30 |
| | | | US | | | | | | | | |
| 8/2/2013 | | 6:38:00 PM | | 10:50:00 PM | | | | | | 4:00 | 2479:30 |
| 8/3/2013 | | 1:29:00 PM | | 5:29:00 PM | | | | | | 4:00 | 2483:30 |
| | | | US | | | | | | | | |
| 8/3/2013 | | 6:26:00 PM | | 10:31:00 PM | | | | | | 4:00 | 2487:30 |
| 8/6/2013 | | 1:26:00 PM | | 5:32:00 PM | | | | | | 4:00 | 2491:30 |
| | | | US | | | | | | | | |
| 8/6/2013 | | 6:31:00 PM | | 10:31:00 PM | | | | | | 4:00 | 2495:30 |
| 8/7/2013 | | 1:28:00 PM | | 5:34:00 PM | | | | | | 4:00 | 2499:30 |
| | | | US | | | | | | | | |
| 8/7/2013 | | 6:28:00 PM | | 10:33:00 PM | | | | | | 4:00 | 2503:30 |
| 8/8/2013 | | 1:29:00 PM | | 5:30:00 PM | | | | | | 4:00 | 2507:30 |
| | | | US | | | | | | | | |

# EXHIBIT 21

EXHIBIT 21 - PAGE 259

# Time Detail

| | |
|---|---|
| Time Period: | 5/12/2016 - 7/11/2016 |
| Query: | Previously Selected Employee(s) |
| Actual/Adjusted: | Show hours credited to this period only. |

Data Up to Date:   7/11/2016 5:19:01 PM
Executed on:   7/11/2016 5:18PM GMT-04:00
Printed for:   E047084
Insert Page Break After Each Employee:   No

| Date/Time | Apply To | In Punch | In Exc | Out Punch | Out Exc | Override Amount | Adj/Ent Amount | Money Amount | Day Amount | Totaled Amount | Cum. Tot. Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| *Xfr/Move: Account* | | *Comment* | | | *Xfr: Work Rule* | | | | | | |
| 5/19/2016 | | 10:41:00 AM | | 2:46:00 PM | | | | | | 4:05 | 48:21 |
| 5/20/2016 | | 5:42:00 AM | | 8:14:00 AM | | | | | | 2:32 | 50:53 |
| | | US | | | | | | | | | |
| 5/20/2016 | | 9:16:00 AM | | 1:37:00 PM | | | | | | 4:21 | 55:14 |
| 5/20/2016 | 12:00 AM | Leave Without Pay | | | | | 1:00 | | | | 56:14 |
| | | *Green Time* | | | | | | | | | |
| 5/21/2016 | 12:00 AM | Vacation No Consec | | | | | 8:00 | | | | 64:14 |
| 5/22/2016 | 12:00 AM | Vacation No Consec | | | | | 8:00 | | | | 72:14 |
| 5/23/2016 | 12:00 AM | Personal Time No Consec | | | | | 8:00 | | | | 80:14 |
| 5/26/2016 | | 5:43:00 AM | | 9:49:00 AM | | | | | | 4:06 | 84:20 |
| | | US | | | | | | | | | |
| 5/26/2016 | | 10:48:00 AM | | 1:50:00 PM | | | | | | 3:02 | 87:22 |
| 5/26/2016 | 12:00 AM | Leave Without Pay | | | | | 1:00 | | | | 88:22 |
| | | *Green Time* | | | | | | | | | |
| 5/27/2016 | | 5:44:00 AM | | 10:21:00 AM | | | | | | 4:37 | 92:59 |
| | | US | | | | | | | | | |
| 5/27/2016 | | 11:21:00 AM | | 12:48:00 PM | | | | | | 1:27 | 94:26 |
| 5/27/2016 | 12:00 AM | Sick Time | | | | | 2:00 | | | | 96:26 |
| 5/28/2016 | | 5:43:00 AM | | 9:49:00 AM | | | | | | 4:06 | 100:32 |
| | | US | | | | | | | | | |
| 5/28/2016 | | 10:49:00 AM | | 12:12:00 PM | | | | | | 1:23 | 101:55 |
| 5/28/2016 | 12:00 AM | Leave Without Pay | | | | | 2:30 | | | | 104:25 |
| 5/29/2016 | | 5:43:00 AM | | 9:41:00 AM | | | | | | 3:58 | 108:23 |
| | | US | | | | | | | | | |
| 5/29/2016 | 12:00 AM | Leave Without Pay | | | | | 4:00 | | | | 112:23 |
| | | *Green Time* | | | | | | | | | |
| 5/30/2016 | 12:00 AM | Holiday No Consec | | | | | 8:00 | | | | 120:23 |
| | | *Holiday - Memorial Day* | | | | | | | | | |
| 6/2/2016 | | 5:42:00 AM | | 9:53:00 AM | | | | | | 4:11 | 124:34 |

# Time Detail

| | | | | | | Data Up to Date: | 7/11/2016 5:19:01 PM |
|---|---|---|---|---|---|---|---|
| Time Period: | 5/12/2016 - 7/11/2016 | | | | | Executed on: | 7/11/2016 5:18PM GMT-04:00 |
| Query: | Previously Selected Employee(s) | | | | | Printed for: | E047084 |
| Actual/Adjusted: | Show hours credited to this period only. | | | | | Insert Page Break After Each Employee: | No |

| Date/Time | Apply To | In Punch | In Exc | Out Punch | Out Exc | Override Amount | Adj/Ent Amount | Money Amount | Day Amount | Totaled Amount | Cum. Tot. Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Xfr/Move: Account | | Comment | | | Xfr: Work Rule | | | | | | |
| | | | US | | | | | | | | |
| 6/2/2016 | | 10:52:00 AM | | 2:59:00 PM | | | | | | 4:07 | 128:41 |
| 6/3/2016 | | 5:43:00 AM | | 9:45:00 AM | | | | | | 4:02 | 132:43 |
| | | | US | | | | | | | | |
| 6/3/2016 | | 10:43:00 AM | | 1:32:00 PM | | | | | | 2:49 | 135:32 |
| 6/3/2016 | 12:00 AM | Sick Time | | | | | 1:00 | | | | 136:32 |
| 6/4/2016 | | 5:42:00 AM | | 9:52:00 AM | | | | | | 4:10 | 140:42 |
| | | | US | | | | | | | | |
| 6/4/2016 | | 10:48:00 AM | | 2:11:00 PM | | | | | | 3:23 | 144:05 |
| 6/5/2016 | | 5:43:00 AM | | 9:42:00 AM | | | | | | 3:59 | 148:04 |
| | | | US | | | | | | | | |
| 6/5/2016 | | 10:39:00 AM | | 11:37:00 AM | | | | | | 0:58 | 149:02 |
| 6/5/2016 | 12:00 AM | Leave Without Pay | | | | | 3:15 | | | | 152:17 |
| | | *Green Time* | | | | | | | | | |
| 6/6/2016 | 12:00 AM | Vacation No Consec | | | | | 8:00 | | | | 160:17 |
| 6/9/2016 | | 5:45:00 AM | | 9:45:00 AM | | | | | | 4:00 | 164:17 |
| | | | US | | | | | | | | |
| 6/9/2016 | | 10:45:00 AM | | 2:45:00 PM | | | | | | 4:00 | 168:17 |
| 6/10/2016 | | 5:43:00 AM | | 10:59:00 AM | | | | | | 5:16 | 173:33 |
| | | | US | | | | | | | | |
| 6/10/2016 | | 11:57:00 AM | | 1:33:00 PM | | | | | | 1:36 | 175:09 |
| 6/10/2016 | 12:00 AM | Leave Without Pay | | | | | 1:15 | | | | 176:24 |
| | | *Green Time* | | | | | | | | | |
| 6/11/2016 | | 5:44:00 AM | | 9:53:00 AM | | | | | | 4:09 | 180:33 |
| | | | US | | | | | | | | |

| | | |
|---|---|---|
| **CONFIDENTIAL** | **EXHIBIT 21 - PAGE 261** | **TWC000256** |

# Time Detail

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Time Period: | | 5/12/2016 - 7/11/2016 | | | | | | Data Up to Date: | | | 7/11/2016 5:19:01 PM |
| Query: | | Previously Selected Employee(s) | | | | | | Executed on: | | | 7/11/2016 5:18PM GMT-04:00 |
| Actual/Adjusted: | | Show hours credited to this period only. | | | | | | Printed for: | | | E047084 |
| | | | | | | | | Insert Page Break After Each Employee: | | | No |

| Date/Time | Apply To | In Punch | In Exc | Out Punch | Out Exc | Override Amount | Adj/Ent Amount | Money Amount | Day Amount | Totaled Amount | Cum. Tot. Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| *Xfr/Move:* *Account* | | *Comment* | | | *Xfr:* *Work Rule* | | | | | | |
| 6/11/2016 | | 10:47:00 AM | | 1:31:00 PM | | | | | | 2:44 | 183:17 |
| 6/11/2016 | 12:00 AM | Leave Without Pay | | | | | 1:15 | | | | 184:32 |
| | | *Green Time* | | | | | | | | | |
| 6/12/2016 | | 5:42:00 AM | | 9:40:00 AM | | | | | | 3:58 | 188:30 |
| | | | US | | | | | | | | |
| 6/12/2016 | | 10:35:00 AM | | 11:42:00 AM | | | | | | 1:07 | 189:37 |
| 6/12/2016 | 12:00 AM | Leave Without Pay | | | | | 3:00 | | | | 192:37 |
| | | *Green Time* | | | | | | | | | |
| 6/13/2016 | 12:00 AM | Leave Without Pay | | | | | 4:45 | | | | 197:22 |
| | | *No Accrued Sick Hours* | | | | | | | | | |
| 6/13/2016 | 12:00 AM | Sick Time-Family | | | | | 3:15 | | | | 200:37 |
| | | *Kin Care* | | | | | | | | | |
| 6/16/2016 | | 5:42:00 AM | | 9:56:00 AM | | | | | | 4:14 | 204:51 |
| | | | US | | | | | | | | |
| 6/16/2016 | | 10:55:00 AM | | 2:48:00 PM | | | | | | 3:53 | 208:44 |
| 6/17/2016 | 12:00 AM | ADMN-Vacation No Consec | | | | | 8:00 | | | | 216:44 |
| | | *FMLA* | | | | | | | | | |
| | | *No Accrued Sick Hours* | | | | | | | | | |
| 6/18/2016 | 12:00 AM | ADMN-Leave Without Pay | | | | | 7:45 | | | | 224:29 |
| 6/18/2016 | 12:00 AM | ADMN-Vacation No Consec | | | | | 0:15 | | | | 224:44 |
| | | *No Accrued Sick Hours* | | | | | | | | | |
| 6/19/2016 | 12:00 AM | ADMN-Leave Without Pay | | | | | 8:00 | | | | 232:44 |
| | | *No Accrued Sick Hours* | | | | | | | | | |
| 6/20/2016 | 12:00 AM | ADMN-Leave Without Pay | | | | | 8:00 | | | | 240:44 |
| 6/23/2016 | 12:00 AM | ADMN-Leave Without Pay | | | | | 8:00 | | | | 248:44 |
| | | *No Accrued Sick Hours* | | | | | | | | | |
| 6/24/2016 | | 5:42:00 AM | | 8:01:00 AM | | | | | | 2:19 | 251:03 |
| | | | US | | | | | | | | |
| 6/24/2016 | | 8:50:00 AM | | 2:45:00 PM | | | | | | 5:55 | 256:58 |
| 6/25/2016 | | 5:42:00 AM | | 9:57:00 AM | | | | | | 4:15 | 261:13 |
| | | | US | | | | | | | | |

# Time Detail

| | | | |
|---|---|---|---|
| Time Period: | 5/12/2016 - 7/11/2016 | Data Up to Date: | 7/11/2016 5:19:01 PM |
| Query: | Previously Selected Employee(s) | Executed on: | 7/11/2016 5:18PM GMT-04:00 |
| Actual/Adjusted: | Show hours credited to this period only. | Printed for: | E047084 |
| | | Insert Page Break After Each Employee: | No |

| Date/Time | Apply To | In Punch | In Exc | Out Punch | Out Exc | Override Amount | Adj/Ent Amount | Money Amount | Day Amount | Totaled Amount | Cum. Tot. Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| *Xfr/Move: Account* | | *Comment* | | | *Xfr: Work Rule* | | | | | | |
| 6/25/2016 | | 10:52:00 AM | | 2:18:00 PM | | | | | | 3:26 | 264:39 |
| 6/26/2016 | | 5:42:00 AM | | 9:54:00 AM | | | | | | 4:12 | 268:51 |
| | | | US | | | | | | | | |
| 6/26/2016 | | 10:50:00 AM | | 2:05:00 PM | | | | | | 3:15 | 272:06 |
| 6/26/2016 | 12:00 AM | Leave Without Pay | | | | | 0:30 | | | | 272:36 |
| | | *Green Time* | | | | | | | | | |
| 6/27/2016 | | 5:44:00 AM | | 9:45:00 AM | | | | | | 4:01 | 276:37 |
| | | | US | | | | | | | | |
| 6/27/2016 | | 10:42:00 AM | | 2:45:00 PM | | | | | | 4:03 | 280:40 |
| 6/30/2016 | 12:00 AM | Leave Without Pay | | | | | 4:45 | | | | 285:25 |
| | | *No Accrued Sick Hours* | | | | | | | | | |
| 6/30/2016 | 12:00 AM | Sick Time | | | | | 3:15 | | | | 288:40 |

# EXHIBIT 22

EXHIBIT 22 - PAGE 264

# THE MARKHAM LAW FIRM

• 750 B Street, Suite 1950 • San Diego, California 92101 •
•Phone: (619) 399-3995• Fax: (619) 615-2067•
•EMAIL: MREALIN@MARKHAM-LAW.COM

April 20, 2016

**Via Certified Mail Return Receipt Requested:**

Labor and Workforce Development Agency
Attn. PAGA Administrator
1515 Clay Street, Ste. 801
Oakland, California 94612

Re:   Wage/Hour Claims of Jessica Hueneberg ("Employee") against Time Warner Cable
Administration, LLC ("Time Warner" or "Employer")

**NOTICE OF LABOR CODE VIOLATIONS PURSUANT TO LABOR CODE §2699.3**

To:   PAGA Administrator, California Labor and Workforce Development Agency
("LWDA")

From:  Jessica Hueneberg ("Employee"), who was subjected to the wage and hour practices as
set forth below

Pursuant to California Labor Code section 2699.3, this letter is intended to provide written
notice of intent to file a representative civil action by an aggrieved employee pursuant to
subdivisions (a) and (f) of California Labor Code section 2699. The aggrieved employee is
Jessica Hueneberg. The provisions of the California Labor Code that have been violated,
including the facts and theories to support the alleged violation, are set forth below.

Ms. Hueneberg is a resident of the State of California. During the applicable time period, Ms.
Hueneberg was employed in California by Time Warner as customer service professional. She
intends to bring a representative action on behalf of herself and other aggrieved current and
former California employees as provided for in California Labor Code section 2698, *et seq.,*
known as the Private Attorneys General Act of 2004 ("PAGA").

Time Warner employs numerous employees in the State of California. During the relevant
time period, the Employer utilized consistent policies and procedures regarding the Employee
and others similarly situated, in violation of Labor Code sections 226(a), 510, 512, 226.7, 1194,
1197 and 1198, as follows:

1

EXHIBIT 22 - PAGE 265

First, Employer required Employee and other similarly situated customer service professionals to be at their work stations ready to take their first call at their scheduled shift start time. This requires customer service professionals to log on to Employer's computers and then open and load software, before one of the programs starts Employee payroll clock. This process can take up to 40 minutes before the Employee is clocked in into Employer's timekeeping system. As such, in violation of Labor Code sections 510(a), 1194, 1197 and 1998 and the applicable Industrial Wage Order, the Employer, by failing to pay the Employee and all others similarly situated for all hours worked, failed to pay all straight time, minimum wages and overtime wages due.

Second, Employer's policies and procedures caused Employee and other aggrieved employees to delay their meal breaks past the fifth hour after the start of the employee shift, in order to assist customers. This violates Labor Code section 512(a), which provides that: "An employer may not employ an employee for a work period of more than five hours per day without providing the employee with a meal period of at least 30 minutes…" Employee and other aggrieved employees were not were not paid meal break premiums for those late meal periods, in violation of Labor Code section 226.7(c).

Further, California Labor Code section 226(a) provides that every employer is required to furnish each employee with accurate itemized statements in writing showing, in part, "gross wages earned," (§226(a)(1)), "net wages earned" (§226(a)(5)), and "all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee…" (§226(a)(9)). Here, because the Employer failed to pay for all regular and/or overtime hours worked at the appropriate straight time or overtime rate, and failed to pay meal break premiums, improper paystubs were issued to Employee and other aggrieved employees, and the Employee alleges that the Employer has derivatively violated Labor Code section 226(a).

Ms. Hueneberg, as an aggrieved employee and on behalf of herself and all other current or former Time Warner employees, seeks all penalties or remedies as may be allowed under PAGA, and by this letter gives written notice of her PAGA claim pursuant to Labor Code section 2699.3. Please advise within thirty (30) calendar days of the postmark date of this Notice whether the LWDA intends to investigate the violations alleged above. We understand that if we do not receive a response within thirty-three (33) calendar days of the postmark date of this Notice that the LWDA intends to investigate these allegations, the aggrieved Employee may immediately thereafter commence a civil action against the Employer pursuant to Labor Code §2699.

Ms. Hueneberg is represented in this matter by The Markham Law Firm.

Very truly yours,

THE MARKHAM LAW FIRM

2

**EXHIBIT 22 - PAGE 267**

David R. Markham

**cc: (via Certified Mail)**
TWC Administration LLC
Legal Department
60 Columbus Circle
New York, NY 10023

David R. Markham (SBN 071814)
*dmarkham@markham-law.com*
Peggy J. Reali (SBN 153102)
*preali@markham-law.com*
Maggie Realin (SBN 263639)
*mrealin@markham-law.com*
Ben Travis (SBN 305641)
*btravis@markham-law.com*
**THE MARKHAM LAW FIRM**
750 B Street, Suite 1950
San Diego, California 92101
Tel.:  (619) 399-3995
Fax:  (619) 615-2067

Walter L. Haines (SBN 71075)
*walter@whaines.com*
**UNITED EMPLOYEES LAW GROUP, PC**
5500 Bolsa Avenue, Suite 201
Huntington Beach, CA 9264
Tel:  (562) 256-1047
Fax:  (562) 256-1006

Attorneys for Plaintiff
on behalf of herself and other aggrieved employees

**ELECTRONICALLY FILED**
Superior Court of California,
County of San Diego

**06/03/2016** at 12:54:23 PM

Clerk of the Superior Court
By Jessica Pascual, Deputy Clerk

**SUPERIOR COURT FOR THE STATE OF CALIFORNIA**

**COUNTY OF SAN DIEGO**

| | |
|---|---|
| JESSICA HUENEBERG, an individual, on behalf of herself and other aggrieved employees, <br><br> Plaintiff, <br><br> v. <br><br> TWC ADMINISTRATION, LLC, a Delaware limited liability company, and DOES 1-10, inclusive, <br><br> Defendant. | **CASE NO.** 37-2016-00018788-CU-OE-CTL <br><br> <u>**REPRESENTATIVE ACTION**</u> <br><br> **COMPLAINT FOR VIOLATIONS OF THE PRIVATE ATTORNEY GENERAL ACT OF 2004 ("PAGA") (CAL. LAB. CODE §2698, *et seq.*)** <br><br><br> **DEMAND FOR JURY TRIAL** |

EXHIBIT 22 - PAGE 269
Complaint

Plaintiff JESSICA HUENEBERG ("Plaintiff"), by and through her attorneys of record, brings this action on behalf of herself and all other persons currently or formerly employed by TWC ADMINISTRATION, LLC ("TWC" or "Defendant"), and DOES 1 through 10, inclusive. Plaintiff hereby alleges, on information and belief, except for information based on personal knowledge, which allegations are likely to have evidentiary support after further investigation and discovery, as follows:

## I.   **INTRODUCTION**

1.     This case is brought as a "Representative Action" arising from Defendant's violations of the Private Attorney General Act ("PAGA") of 2004, California Labor Code section 2698, *et seq*., and is filed on behalf of Plaintiff and all individuals who had or have the job title or position as a customer service professional, including any of Defendant's job positions with similar duties and/or job titles, and who are or formerly were employed by Defendant within the State of California during the relevant time period, defined as one (1) year from the date of service of Notice on the California Labor and Workforce Development Agency (LWDA) and on the agent for service of process of Defendant, and DOES 1 through 10, inclusive, as provided by Labor Code section 2699.3(a), until commencement of trial in this matter.  Excluded from this action are individuals whose claims were asserted and subsequently settled in the action titled *Gillings v. Time Warner Cable, LLC*, *et al.,* United States District Court for the Central District of California, case number 2:10-cv-05565.

2.     This action is commenced by Plaintiff on behalf of herself and other non-exempt hourly-paid customer service professionals who, during the relevant time period: (1) were not paid for all hours worked, including overtime, in that Plaintiff and other aggrieved employees were not compensated for time spent booting up their computers and uploading programs necessary to perform their job duties, which took up to 40 minutes every day, in violation of Labor Code sections 510(a), 1194, 1197 and 1198; (2) were not provided with timely meal periods, in that the press of business required Plaintiff and other aggrieved employees to delay their meal periods after they assisted Defendant's customers, and Plaintiff and other aggrieved employees were not provided meal period premiums for those late meal periods, in violation of Labor Code sections 512 and 226.7; and (3) were not provided with accurately itemized wage statements as none of the wage statements

EXHIBIT 22 - PAGE 270

1.
Complaint

1   accurately reflected the additional wages owed to Plaintiff and aggrieved employees for straight and

2   overtime wages, and premiums for late meal periods, in violation of Labor Code section 226(a).

3        3.    During the relevant time period, Defendant had a policy and practice which required

4   Plaintiff and other similarly situated customer service professionals to be at their work stations ready

5   to take their first call at their scheduled shift start time.  This required customer service professionals

6   to log on to Defendant's computers and then open and load software necessary to perform their work

7   duties, before one of the programs started the employee payroll clock.  This process takes substantial

8   amount of time, not to be deemed "*de minimis*."  Plaintiff and other aggrieved employees were not

9   compensated for those pre-shift work activities, even though: (1) no practical administrative difficulty

10  of recording the additional time exists or existed for Defendant during the relevant time period; (2) it

11  is or was feasible for Defendant to determine or estimate the average time it takes each employee to

12  complete his or her pre-shift start-up sequence, as all aggrieved employees at issue in this action

13  needed the same computer programs/applications in order to perform their work duties.

14       4.    Further, during the relevant time period, Defendant has had a consistent policy and

15  practice of requiring those who held the position of customer service professional, including the

16  Plaintiff, to work more than five hours without a meal period of at least thirty minutes, and failing to

17  pay such employees one (1) hour of pay at the employees' regular rate of compensation for each

18  workday that the meal break was not provided, as required by California was and hour laws.

19       5.    Further, during the relevant time period, Defendant knowingly and intentionally failed to

20  provide Plaintiff and other aggrieved employees it employs within the State of California, with

21  accurate semimonthly itemized wage statements.  Plaintiff is informed and believes, and on that basis

22  alleges that none of the statements provided by Defendant accurately reflected the straight and

23  overtime wages owed to Plaintiff and other aggrieved employees for their pre-shift work activities,

24  and premium payments owed to them for late meal periods.

25       6.    By this Complaint, Plaintiff brings this case as a "Representative Action" seeking

26  penalties for the State of California in a representative capacity, as provided by the Private Attorney

27  General Act ("PAGA") to the extent permitted by law, as an aggrieved employee who held the

28  position identified above, did not receive all compensable regular and overtime compensation, meal

period premiums, and was not provided with accurately itemized wage statements. Plaintiff, on behalf of herself and other aggrieved employees of Defendant, alleges that Defendant violated Labor Code 510(a), 512, 1194, 1197, 1198, 226.7 and 226(a), to which PAGA applies under Labor Code section 2699.5, and seeks compensation for unpaid wages and premiums, penalties when allowed, and other relief, and reasonable attorneys' fees and costs.

7.     On April 20, 2016 Plaintiff sent a certified notice to the California Labor and Workforce Development Agency (LWDA) and to Defendant's corporate office, to the extent such address is made available by the California Secretary of State.  A true and correct copy of the notice is attached hereto as **Exhibit "A"** and is incorporated herein by this reference.  The notice has been sent pursuant to Labor Code section 2699.3(a) of PAGA, which provides, in subsection (2)(A): "Upon receipt of [the] notice or if no notice is provided within 33 calendar days of the postmark date of the notice given pursuant to paragraph (1), the aggrieved employee may commence a civil action pursuant to section 2699."  By serving the notice before one year from any date of separation from the employer, Plaintiff's claim under PAGA is timely and within the applicable statute of limitations period.

8.     As of the date of this complaint, the LWDA has not responded to Plaintiff's notice. Accordingly, Plaintiff files this action as a "Representative Action" as provided by California Code of Civil Procedure and as specifically permitted and authorized by Labor Code §2699.3(a)(2)(A).

## II.    <u>JURISDICTION AND VENUE</u>

9.     Venue is proper in San Diego County pursuant to Code of Civil Procedure, section 395, because Defendant conducts business in this County and because Plaintiff is employed in this County.  The unlawful acts alleged have a direct effect on Plaintiff and other employees within this County and the State of California.

10.    Based on information and belief, Plaintiff alleges that this entire action arises solely under state law of the State of California.  Plaintiff alleges, on information and belief, that no federal question is raised and that the Class Action Fairness Act ("CAFA"), 28 U.S.C. Section 1332(d), does not apply, or in the alternative, that exceptions for local case or controversy under CAFA do apply and prohibit removal of the action the federal court.  The individual monetary claims of Plaintiff do not exceed $74,999, exclusive of interest and costs.

EXHIBIT 22 - PAGE 272
- 3 -
Complaint

### III.   THE PARTIES

**A.     The Plaintiff**

11.     Plaintiff JESSICA HUENEBERG is a resident of San Diego, California.  At all relevant times herein, between June 2014, and the present, Plaintiff was employed by TWC, and DOES 1 through 10, inclusive, as a non-exempt hourly-paid customer service professional at one of TWC's locations in San Diego, California.  Plaintiff's duties included assisting TWC'S customers on the telephone regarding issues such as sales, billing, or technology support, among other duties.  In order to perform her work duties, Plaintiff had to boot up her computer every morning and upload certain programs.  This process takes substantial amount of time, not to be deemed "*de minimis*." Plaintiff was only able to clock in into Defendant's time keeping program once all of other programs necessary to perform her work were up and running.  Therefore, to be able to assist Defendant's customers at the start of her shift time, Plaintiff had to arrive at her work station of up to one hour before the start of her shift  to boot up her computer and open all programs necessary to do her job. Plaintiff was not paid for this time, in violation of Labor Code sections 510(a), 1194, 1197 and 1198.

12.     Further, in the course of her employment, Plaintiff was required to work in excess of five (5) hours per day without being provided timely meal periods, and was not compensated one (1) hour of pay at the regular rate of compensation for each workday that a meal period was not provided, in violation of Labor Code section 512, 226.7, and Industrial Welfare Commission Orders.

13.     For the same reason, the wage statements provided to Ms. Hueneberg were inaccurate, as they failed to reflect all hours she worked, and all meal period premiums she was owed, and therefore incorrectly stated her gross and net wages.

**B.     The Defendant**

14.     Defendant TWC is among the largest providers of video, high-speed data and voice services in the United States, connecting 16 million customers to entertainment, information and each other. TWC has a regional headquarters in Ontario, California.  Defendant employed Plaintiff at their northern Southern California location, and employ/employed other customer service professionals throughout California.

15.     The true names and capacities, whether individual, corporate, associate, or otherwise, of

Defendants sued herein as DOES 1-10, inclusive, are currently unknown to Plaintiff who therefore sues Defendants by such fictitious names under Cal. Code Civ. Proc. §474.  Plaintiff alleges that each of the Defendants designated herein as a DOE is legally responsible in some manner for the unlawful acts referred to herein.  Plaintiff will seek leave of court to amend this Complaint to reflect the true names and capacities of the Defendants designated hereafter as DOES when such identities become known.

16.   Plaintiff alleges that each Defendant acted in all respects pertinent to this action as the agent of the other Defendants, carried out a joint scheme, business plan or policy in all respects pertinent hereto, and the acts of each defendant are legally attributable to the other Defendants. Further, Defendants in all respects acted as the employer and/or joint employer of Plaintiff and other aggrieved employees.  Finally, Plaintiff alleges that each defendant was the alter ego of the other and that it would be unjust to treat each defendant separately for purposes of imposing liability.

## IV.   GENERAL ALLEGATIONS

17.   During the relevant time period asserted hereto, Plaintiff and other aggrieved employees were non-exempt, hourly paid employees within the meaning of the California Labor Code, and the implementing rules and regulations of the California IWC Wage Orders, in the State of California. Plaintiff suffered damages, wage loss and legally cognizable harm due to Defendant's policies and practices, and has standing to bring this case individually and as a representative for other similarly impacted employees.

18.   Defendant hires employees throughout the state of California to work as customer service professionals.  Under sections 510(a), 1194, 1197 and 1198 of the California Labor Code, and the applicable Wage Order, non-exempt employees are to be paid for all hours worked, including overtime, which is to be paid at 1.5 times their regular rate of pay for all hours worked in excess of eight (8) hours per workday and/or forty (40) hours per workweek. Lab. Code, § 510(a).

19.   TWC required Plaintiff and other aggrieved employees to be at their work stations ready to take their first call at their scheduled shift time.  This required Plaintiff and other customer service professionals to log on to Defendant's computer and then open and load software, before they were able to clock in into Defendant's timekeeping system.  This process takes substantial amount of time,

EXHIBIT 22 - PAGE 274
-5-
Complaint

not to be deemed "*de minimis*."  Plaintiff and other aggrieved employees were not paid for this time, even though: (1) no practical administrative difficulty of recording the additional time exists or existed for Defendant during the relevant time period; (2) it is or was feasible for Defendant to determine or estimate the average time it takes each employee to complete his or her pre-shift start-up sequence, as all aggrieved employees at issue in this action needed the same computer programs/applications in order to perform their work duties.

20.  Further, TWC's policies and practices caused Plaintiff and other aggrieved employees to delay their meal periods.  If Plaintiff was on the telephone with a customer, she had to delay her meal break until after the customer call concluded.  This prevented her from taking timely meal periods, as prescribed by Labor Code section 512, and the applicable Wage Orders.  Plaintiff was not paid premium payments for such late meal breaks, in violation of Labor Code section 226.7.

21.  Further, California Labor Code section 226(a) provides that every employer is required to furnish each employee with accurate itemized statements in writing showing, in part, "gross wages earned," (§226(a)(1)), "net wages earned" (§226(a)(5)), and "all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee…" (§226(a)(9)).  During the relevant time period, Defendants failed to pay Plaintiff and other aggrieved employees wages for all regular and overtime hours worked, as well as premium payments for late meal periods.  Consequently, Plaintiff's statements failed to correctly state the number hours worked, and failed to correctly state Plaintiff's and other aggrieved employees' gross and net wages.  This information was inaccurate on most if not all statements for every payroll periods during Plaintiff's employment with TWC.  TWC's payroll system is believed to operate in the same way as to all aggrieved employees.  As a result, Plaintiff was provided with statements that failed to comply with California Labor Code section 226(a).

22.  In summary, Defendant's policies and/or practices resulted in:  (i) failure to pay Plaintiff and other aggrieved employees all straight time, minimum and overtime wages due; (ii) failure to provide Plaintiff and other aggrieved employees with timely meal periods; and (iii) failure to provide Plaintiff and other aggrieved employees with accurate semimonthly itemized wage statements.  These policies and practices therefore violated California Labor Code sections 226(a), 226.7, 510(a), 512,

1194, 1197 and 1198, to which penalties under PAGA apply pursuant to Labor Code section 2699.5.

## V.   FIRST CAUSE OF ACTION

**Violation of the Private Attorney General Act of 2004 ("PAGA")**
**(On Behalf of each Aggrieved Employee Against each Defendant)**

23.   Plaintiff re-alleges and incorporates by this reference each of the foregoing paragraphs as if fully set forth herein.

24.   Plaintiff, by virtue of her employment with Defendant, and the Defendant's failure to: (i) pay Plaintiff and other aggrieved employees all straight time, minimum and overtime wages due; (ii) provide Plaintiff and other aggrieved employees with timely meal periods; and (iii) provide Plaintiff and other aggrieved employees with accurate semimonthly itemized wage statements, is an aggrieved employee with standing to bring an action under the Private Attorney General Act ("PAGA"). Plaintiff has satisfied all prerequisites to serve as a representative of the general public to enforce California's labor laws, including, without limitation, the notice requirement identified in Labor Code section 2699.3(a) **(Exhibit "A")**.  Because the LWDA did not advise that it intends to investigate Plaintiff's allegations within 33 days from the postmarked date of Plaintiff's notice, Plaintiff, as a representative of the people of the State of California, will seek any and all penalties otherwise capable of being collected by the Labor Commission and/or the Department of Labor Standards Enforcement (DLSE). This includes each of the following, as set forth in Labor Code Section 2699.5, which provides that Section 2699.3(a) applies to any alleged violation of the following provisions: subdivision (a) of Section 226, sections 226.7, 510(a), 512, 1194, 1197 and 1198.

25.   Plaintiff is informed and believes that Defendant has violated and continues to violate provisions of the Labor Code and applicable Wage Orders related to the payment of wages.  As of the date of this Complaint, the LWDA has not advised whether it intends to pursue this matter. Therefore, by operation of law, Plaintiff is entitled to commence this cause of action in this Court as a representative action under PAGA on behalf of the state of California.

26.   Plaintiff as a personal representative of the general public, will and does seek to recover any and all penalties for each and every violation shown to exist or to have occurred during the one year period before Plaintiff filed Notice with the LWDA of her intent to bring this action, in an

amount according to proof, as to those penalties that are otherwise only available to public agency enforcement actions. Funds recovered will be distributed in accordance with PAGA, with at least 75% of the penalties recovered being reimbursed to the State of California through the Labor and Workforce Development Agency (LWDA).

## VI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself individually and all other aggrieved employees Plaintiff seeks to represent, prays for relief as follows:

A.      For penalties for each violation of the Private Attorney General Act ("PAGA");

B.      Pre-Judgment and Post-Judgment interest, as provided by law;

C.      Such other equitable relief as the Court may deem just and proper;

D.      Attorneys' fees and costs of suit; and

E.      Such other legal equitable relief as this Court deems necessary, just, equitable and proper.

Dated: June 3, 2016.                          THE MARKHAM LAW FIRM

By: _____
      David R. Markham

**THE MARKHAM LAW FIRM**
David R. Markham
Peggy J. Reali
Maggie Realin
Ben Travis
750 B Street, Suite 1950
San Diego, California 92101
Tel.:  (619) 399-3995

**UNITED EMPLOYEES LAW GROUP, PC**
Walter L. Haines
5500 Bolsa Avenue, Suite 201
Huntington Beach, CA 92649
Tel:  (562) 256-1047

Attorney for Plaintiff and other aggrieved employees

EXHIBIT 22 - PAGE 277
8
Complaint

1

2

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial with respect to all issues triable of right by jury.

3

4

Dated: June 3, 2016.                           THE MARKHAM LAW FIRM

5

6

By: _____
                                                    David R. Markham

7

8

**THE MARKHAM LAW FIRM**
David R. Markham
Peggy J. Reali
Maggie Realin
Ben Travis
750 B Street, Suite 1950
San Diego, California 92101
Tel.:  (619) 399-3995

9

10

11

12

**UNITED EMPLOYEES LAW GROUP, PC**
Walter L. Haines
5500 Bolsa Avenue, Suite 201
Huntington Beach, CA 92649
Tel:  (562) 256-1047

13

14

15

Attorney for Plaintiff and other aggrieved
employees

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

EXHIBIT 22 - PAGE 279

# THE MARKHAM LAW FIRM

• 750 B Street, Suite 1950 • San Diego, California 92101 •
•Phone: (619) 399-3995• Fax: (619) 615-2067•
•EMAIL: MREALIN@MARKHAM-LAW.COM

April 20, 2016

**Via Certified Mail Return Receipt Requested:**

Labor and Workforce Development Agency
Attn. PAGA Administrator
1515 Clay Street, Ste. 801
Oakland, California 94612

Re:   Wage/Hour Claims of Jessica Hueneberg ("Employee") against Time Warner Cable
        Administration, LLC ("Time Warner" or "Employer")

## NOTICE OF LABOR CODE VIOLATIONS PURSUANT TO LABOR CODE §2699.3

To:    PAGA Administrator, California Labor and Workforce Development Agency
         ("LWDA")

From:  Jessica Hueneberg ("Employee"), who was subjected to the wage and hour practices as
         set forth below

Pursuant to California Labor Code section 2699.3, this letter is intended to provide written notice of intent to file a representative civil action by an aggrieved employee pursuant to subdivisions (a) and (f) of California Labor Code section 2699. The aggrieved employee is Jessica Hueneberg. The provisions of the California Labor Code that have been violated, including the facts and theories to support the alleged violation, are set forth below.

Ms. Hueneberg is a resident of the State of California. During the applicable time period, Ms. Hueneberg was employed in California by Time Warner as customer service professional. She intends to bring a representative action on behalf of herself and other aggrieved current and former California employees as provided for in California Labor Code section 2698, *et seq.,* known as the Private Attorneys General Act of 2004 ("PAGA").

Time Warner employs numerous employees in the State of California. During the relevant time period, the Employer utilized consistent policies and procedures regarding the Employee and others similarly situated, in violation of Labor Code sections 226(a), 510, 512, 226.7, 1194, 1197 and 1198, as follows:

1

EXHIBIT 22 - PAGE 280

First, Employer required Employee and other similarly situated customer service professionals to be at their work stations ready to take their first call at their scheduled shift start time. This requires customer service professionals to log on to Employer's computers and then open and load software, before one of the programs starts Employee payroll clock. This process can take up to 40 minutes before the Employee is clocked in into Employer's timekeeping system. As such, in violation of Labor Code sections 510(a), 1194, 1197 and 1998 and the applicable Industrial Wage Order, the Employer, by failing to pay the Employee and all others similarly situated for all hours worked, failed to pay all straight time, minimum wages and overtime wages due.

Second, Employer's policies and procedures caused Employee and other aggrieved employees to delay their meal breaks past the fifth hour after the start of the employee shift, in order to assist customers. This violates Labor Code section 512(a), which provides that: "An employer may not employ an employee for a work period of more than five hours per day without providing the employee with a meal period of at least 30 minutes..." Employee and other aggrieved employees were not were not paid meal break premiums for those late meal periods, in violation of Labor Code section 226.7(c).

Further, California Labor Code section 226(a) provides that every employer is required to furnish each employee with accurate itemized statements in writing showing, in part, "gross wages earned," (§226(a)(1)), "net wages earned" (§226(a)(5)), and "all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee..." (§226(a)(9)). Here, because the Employer failed to pay for all regular and/or overtime hours worked at the appropriate straight time or overtime rate, and failed to pay meal break premiums, improper paystubs were issued to Employee and other aggrieved employees, and the Employee alleges that the Employer has derivatively violated Labor Code section 226(a).

Ms. Hueneberg, as an aggrieved employee and on behalf of herself and all other current or former Time Warner employees, seeks all penalties or remedies as may be allowed under PAGA, and by this letter gives written notice of her PAGA claim pursuant to Labor Code section 2699.3. Please advise within thirty (30) calendar days of the postmark date of this Notice whether the LWDA intends to investigate the violations alleged above. We understand that if we do not receive a response within thirty-three (33) calendar days of the postmark date of this Notice that the LWDA intends to investigate these allegations, the aggrieved Employee may immediately thereafter commence a civil action against the Employer pursuant to Labor Code §2699.

Ms. Hueneberg is represented in this matter by The Markham Law Firm.

Very truly yours,

THE MARKHAM LAW FIRM

2

EXHIBIT 22 - PAGE 281

David R. Markham

**cc: (via Certified Mail)**
TWC Administration LLC
Legal Department
60 Columbus Circle
New York, NY 10023

3

EXHIBIT 22 - PAGE 282

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

**Labor and Workforce Development Agency**

Attn. PAGA Administrator
1515 Clay Street, Ste. 801
Oakland, California 94612

Hueneberg v. Time Warner Cable
Notice of Labor Code Violations

2. Article Number
(Transfer from service label)   7015 0920 0002 3718 4906

PS Form 3811, July 2013         Domestic Return Receipt

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X    RECEIVED    ☐ Agent
                  ☐ Addressee
DEPT OF INDUSTRIAL RELATIONS
B. Received by (Printed Name)    C. Date of Delivery
APR 26 2016

D. Is delivery address different from Item 1?   ☐ Yes
   If YES, enter delivery address below:         ☐ No
LABOR STANDARDS ENFORCEMENT
OAKLAND DISTRICT OFFICE

3. Service Type
☑ Certified Mail®        ☐ Priority Mail Express™
☐ Registered            ☐ Return Receipt for Merchandise
☐ Insured Mail          ☐ Collect on Delivery

4. Restricted Delivery? (Extra Fee)    ☐ Yes

EXHIBIT 22 - PAGE 283